H. RUSSELL MORSS, Jr., UNION COUNTY PROSECUTOR,
PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v.
MALCOLM S. FORBES, DONAL C. FOX, FRANK W.
SHERSHIN, DOMINICK A. CUNDARI, PAUL M. SALS-
BURG AND JOSEPH W. THURING, INDIVIDUALLY AND
AS MEMBERS OF THE LEGISLATURE OF THE STATE
OF NEW JERSEY AND AS MEMBERS OF THE "JOINT
LEGISLATIVE COMMITTEE TO STUDY WIRETAPPING
AND THE UNAUTHORIZED RECORDING OF SPEECH,"
DEFENDANTS-RESPONDENTS AND CROSS-APPEL-
LANTS.

Argued March 16, 1957—Decided May 20, 1957.

344

*Mr. David M. Satz, Jr.,* Deputy Attorney-General, and *Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, argued the cause for plaintiff-appellant and cross-respondent (*Mr. David D. Furman,* Deputy Attorney-General, on the brief).

*Mr. Walter H. Jones* argued the cause for defendants-respondents and cross-appellants, as members of the Senate and General Assembly of the State of New Jersey (*Mr.*

*Russell T. Kerby, Jr.,* attorney for defendants-respondents and cross-appellants, as members of the Joint Legislative Committee, etc.).

The opinion of the court was delivered by

WACHENFELD, J. The plaintiff, Prosecutor for Union County, appeals by leave of the Appellate Division, granted pursuant to *R. R.* 2:2–3, from part of an interlocutory judgment rendered in the Superior Court, Chancery Division, on October 9, 1956. We granted certification on our own motion.

The defendants are members of the Legislature of the State of New Jersey and by Senate Concurrent Resolution No. 4 (1956) are designated and function as the "Joint Legislative Committee to Study Wiretapping and the Unauthorized Recording of Speech." The defendants hereafter are referred to as the "Committee."

During its study and investigation the Committee requested certain information from the plaintiff concerning his knowledge of wiretapping activities. On July 18, 1956 he appeared voluntarily before the Committee at a closed session and there disclosed that on three occasions he had obtained information by way of wiretaps on telephone lines of suspected violators of the criminal law. He contended his actions were not in violation of *N. J. S.* 2A:146–1, which makes the willful and malicious interception of telephonic communications a misdemeanor.

While plaintiff voluntarily revealed the nature and scope of his own activities, he withheld all other information from the Committee regarding these transactions on the basis that as a matter of public policy he was obliged to guard against the disclosure of confidential communications and to protect the identity of informants. Plaintiff's interpretation of *N. J. S.* 2A:146–1 was not concurred in by the Committee, which took the view that the law applied as stringently to him as to anyone else.

Subsequent to his initial appearance, plaintiff was requested by the Committee's counsel to appear at a public hearing in

Trenton on July 23, 1956 in order to give a formal statement defining his interpretation of *N. J. S.* 2A:146–1. When plaintiff complied with this request, he was served with a subpoena, returnable on the following day, requiring him to testify and to produce certain office records relating to the information he had withheld at the closed session on July 18, 1956. In general, the subpoena demanded all evidence and writings relevant to the premises of the Committee's investigation, including the names and addresses of all persons who had performed, recommended, procured or assisted in wiretapping during plaintiff's term as prosecutor, whether outside agencies or members of his personal staff. By mutual consent, the return date of the subpoena was postponed from July 24, 1956 to July 27, 1956.

In the interim before he was compelled to appear, plaintiff instituted an action by way of verified complaint and order to show cause seeking injunctive relief and a declaratory judgment. The determination of this cause in the court below constitutes the foundation for the present appeal.

Plaintiff invoked the jurisdiction of the courts upon the representation of an insolvable dilemma which would place him in criminal jeopardy for the assertion of legally protected rights. He deemed himself faced with two alternatives: he could either appear before the Committee and divulge the information which it sought, or he could refuse to disclose the so-called law enforcement secrets and run the risk of violating *R. S.* 52:13–3, which he conceived to be unconstitutional.

*R. S.* 52:13–3 is part of the comprehensive scheme set forth in *chapter* 13 of *Title* 52 for the summoning of witnesses before legislative investigating committees and their punishment for contempt. Among other things, it provides:

"Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor. * * *"

Plaintiff maintained that the threat of criminal prosecution under a statute reasonably believed to be unconstitutional was sufficient cause to invoke the application of the Declaratory Judgments Act, *N. J. S. A.* 2A:16–50 *et seq.* and also to entitle him to the injunctive relief which he prayed. He asked for an adjudication respecting the constitutionality of *R. S.* 52:13–3 and his rights to withhold the information demanded.

After hearing and consideration of memoranda, the Superior Court, Chancery Division, ruled only: (1) that it had jurisdiction of the cause; (2) that *R. S.* 52:13–3 was constitutional; and (3) that the plaintiff would have to appear before the Committee and to yield certain information and records relating to his wiretapping activities, subject to the conditions enumerated in the court's opinion. These conditions generally permitted the plaintiff to withhold any information relating to the identity of those persons who had actually performed or supervised the wiretap operations, with the exception of members of his staff.

Plaintiff appeals only from that portion of the trial judge's order holding *R. S.* 52:13–3 to be constitutional. His complaint raised a multitude of other questions which are not, however, presented by the record before us. Defendants, according to the terms of an order entered on October 24, 1956, were granted leave by the Appellate Division to cross-appeal from any part of the order of the Chancery Division which was adverse to them.

Before the Chancery Division, and in its brief on appeal, the Committee maintained the courts had no jurisdiction to adjudicate the constitutionality of *R. S.* 52:13–3 because the plaintiff had not yet appeared before the Committee nor been directed to respond to any specific questions. It also challenged the jurisdiction of the trial court to enjoin the Legislature. Defendants argued that although the lower court had expressly disclaimed any intention of passing upon its jurisdiction to interfere with a legislative proceeding, and while it admitted a court had no right to trespass against the legislative or executive departments of

government, it nevertheless accomplished just that by continuing temporary restraints upon a lawfully constituted and functioning legislative committee.

The plaintiff, undaunted by this claim, in turn insists he should prevail because R. S. 52 :13–3 is unconstitutional upon the same principle, to wit, it contravenes the doctrine of separation of powers by arrogating to a legislative committee the function of determining whether a witness has committed a crime.

Although much could be written on the jurisdictional aspects of this proceeding, we are not, by reason of the status of the record, required to pass upon these questions since the defendants on oral argument before us withdrew their previous objections to our jurisdiction and joined in the petition that the constitutionality of R. S. 52 :13–3 be decided.

We shall therefore adjudicate the validity of the last-cited statute, but this is by no means to be considered a precedent establishing a procedure whereby anyone who feels he might be "put upon" by the subpoena or questions of a legislative committee can turn to the courts for a declaratory judgment vindicating his surmise.

Plaintiff insists R. S. 52 :13–3 : (1) affords no standards by which a reasonably intelligent man can determine whether his refusal to answer will subject him to criminal sanctions and is therefore void for violation of the requirements of due process of law; (2) contravenes, as already stated, the doctrine of separation of powers in arrogating to a legislative committee the sole power to determine whether a witness has committed a crime; and (3) constitutes an improper delegation to a committee of a power to be exercised only by the Legislature as a whole. Particular reference is made to those portions of the statute specifying:

"* * * all witnesses sworn before any such committee shall answer truly all questions put to them which the committee shall decide to be proper and pertinent to the investigation or inquiry * * *.

Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor * * *."

Each of plaintiff's arguments is founded upon an interpretation of *R. S.* 52:13-3 with which we cannot agree. He submits that by its terms the statute entrusts the Committee with the sole responsibility and authority for deciding what questions are proper and pertinent and that the witness has no recourse from the Committee's conclusion. He theorizes that the subjective determination of the Committee is the sole criterion of propriety and pertinency and that upon a refusal to answer he would automatically be guilty of a misdemeanor. All this would occur, says plaintiff, without the opportunity for judicial review as to the relevancy of the question and without regard to any privilege on the part of the witness not to answer. It is said: "The only question for the court to determine, in a prosecution under *R. S.* 52:13-3 is the question of whether or not the witness answered the questions before the committee."

Plaintiff contrasts this situation with that prevailing under the federal statute, 2 *U. S. C. A.*, § 192, where witnesses are afforded the protection of judicial review and have some criterion for determining in advance whether or not the question put to them is proper and pertinent. *E. g., Sinclair v. United States,* 279 *U. S.* 263, 49 *S. Ct.* 268, 73 *L. Ed.* 692 (1929).

The Committee, however, flatly asserts in its brief it has no intention of denying anyone the right to review. It says:

"There is nothing in the statute, either express or implied, denying anyone the right of judicial review of any committee's determinations. Nor should this court now place such an interpretation on this law."

Conceivably, the Committee could propound questions which are improper in substance or in form, but we cannot gratuitously assume this will occur. The procedure in this respect must ripen to the extent where specific issues are framed so that they can be intelligently presented and determined by an appropriate tribunal. No blanket adjudication *in futuro* of suppositious issues is warranted. *McGrain v. Daugherty,* 273 *U. S.* 135, 160, 175-176, 47 *S. Ct.* 319, 71 *L. Ed.* 580 (1927).

 This proposition was aptly stated in *Townsend v. United States*, 68 *App. D. C.* 223, 95 *F. 2d* 352, 361 (*D. C. Cir.*), certiorari denied 303 *U. S.* 664, 58 *S. Ct.* 830, 82 *L. Ed.* 1121 (1938), where the powers of a legislative committee in carrying out its function were discussed at length. The court said:

"A legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress. *McGrain v. Daugherty*, 273 *U. S.* 135, 47 *S. Ct.* 319, 71 *L. Ed.* 580, 50 *A. L. R.* 1. A judicial inquiry relates to a *case*, and the evidence to be admissible must be measured by the narrow limits of the pleadings. A legislative inquiry anticipates *all possible cases* which may arise thereunder and the evidence admissible must be responsive to the scope of the inquiry, which generally is very broad. Many a witness in a judicial inquiry has, no doubt, been embarrassed and irritated by questions which to him seemed incompetent, irrelevant, immaterial and impertinent. But that is not a matter for a witness finally to decide. Because a witness could not understand the purpose of cross-examination, he would not be justified in leaving a court room. The orderly processes of judicial determination do not permit the exercise of such discretion by a witness. The orderly processes of legislative inquiry require that the committee shall determine such questions for itself. Within the realm of legislative discretion, the exercise of good taste and good judgment in the examination of witnesses must be entrusted to those who have been vested with authority to conduct such investigations. *Hearst v. Black*, 66 *App. D. C.* 313, 87 *F. 2d* 68. A witness may exercise his privilege of refusing to answer questions and submit to a court the correctness of his judgment in so doing, but in the event he is mistaken as to the law it is no defense, for he is bound rightly to construe the statute. *Sinclair v. United States*, *supra*, 279 *U. S.* 263, at *page* 299, 49 *S. Ct.* 268, 273, 73 *L. Ed.* 692. Beyond this, he must conform to the procedure of the committee and respond to its questions. *McGrain v. Daugherty*, *supra*, 273 *U. S.* 135, at *pages* 175, 176, 47 *S. Ct.* 319, 329, 71 *L. Ed.* 580, 50 *A. L. R.* 1. He cannot be heard to plead justification and, hence, lack of willfulness in defiantly leaving a hearing because he does not like the questions propounded to him—remedy by objection and refusal to answer both being open to him."

We must assume the Committee's efforts are in good faith and that it will exercise, as said in the *Townsend* case, "good taste and good judgment" in the examination of the witnesses it interrogates during its inquiry.

354

■ The Legislature has the authority to investigate, and its powers in this respect are indeed broad. Normally, it has the power to obtain information on any subject relevant to the proper discharge of its legitimate functions. See *Eggers v. Kenny*, 15 *N. J.* 107 (1954); *Quinn v. United States*, 349 *U. S.* 155, 75 *S. Ct.* 668, 99 *L. Ed.* 964 (1955); *Barry v. United States ex rel. Cunningham*, 279 *U. S.* 597, 49 *S. Ct.* 452, 73 *L. Ed.* 867 (1929); *Sinclair v. United States, supra; McGrain v. Daugherty, supra;* 49 *Am. Jur., States, Territories, and Dependencies*, §§ 39 and 43. The necessity for the obtainment of such information is no longer open to debate and has been consistently and vigorously espoused.

■■ Furthermore, it is elementary that a committee may be endowed with some portion of the investigatory power which the Legislature enjoys as a whole. See, *e. g., In re Hague*, 104 *N. J. Eq.* 31, 45 (*Ch.*), affirmed 104 *N. J. Eq.* 369 (*E. & A.* 1929); *Tenney v. Brandhove*, 341 *U. S.* 367, 377–378, 71 *S. Ct.* 783, 95 *L. Ed.* 1019 (1951); *Barry v. United States ex rel. Cunningham, supra*, 279 *U. S.*, at *page 613*, 49 *S. Ct.*, at *page 455; Sinclair v. United States, supra*, 279 *U. S.*, at *page 294*, 49 *S. Ct.*, at *page 272*; 49 *Am. Jur., supra*, at § 39. *Cf. N. J. Constitution* 1947, *Art.* IV, *Sec.* V, *par.* 2. Otherwise, the effective exercise of such power would be impossible and its benefits completely illusory. When a committee is authorized to conduct investigations, the creative resolution becomes the charter defining its authority. The committee must abide by the limitations thus placed upon its authority, and may not operate according to the mere whims and caprices of its members. 49 *Am. Jur., supra*, at § 42, states the principle as follows:

"The scope of the powers of a legislative committee and the matters which it may investigate are referable primarily to the act or resolution to which it owes its existence. Its powers are, generally speaking, as broad as the subject which it is directed to inquire into; when created and appointed for the purpose of securing information and data upon the need of legislation upon

a given subject, it may inquire into any subject and any matter relative to the needs of legislation on the subject matter, the kind of legislation required, and the scope of the legislation needed."

It is this resolution which supplies the referent enabling a court to determine whether an investigating committee has abused its powers by attempting to compel a witness to answer a question which is not proper or pertinent. *United States v. Rumely,* 345 *U. S.* 41, 73 *S. Ct.* 543, 97 *L. Ed.* 770 (1953); *Sinclair v. United States, supra.* The discretion of the committee is confined by the terms of the enactment which established it, and the witness can look to that act as a guide to making his personal decision as to whether or not he should refuse to answer a question.

It is true that such a committee enjoys very extensive authority to examine and investigate, since its "charter" is of necessity liberally construed. See, *e. g., Townsend v. United States, supra;* 49 *Am. Jur., supra,* at § 42. Moreover, as indicated by the *Townsend* quotation, it is essential to an efficient accomplishment of the legislative purpose that in the first instance the committee have the responsibility for determining whether a question is proper and pertinent and should be answered.

The procedure described in *Townsend* and sanctioned by other federal cases is identical with the rationale and purpose of *R. S.* 52:13–3. Our statute expressly states what the federal courts have decided is the import of 2 *U. S. C. A.,* § 192; namely, that the committee has the *initial* obligation of making any determination of pertinency. *Bart v. United States,* 349 *U. S.* 219, 75 *S. Ct.* 712, 99 *L. Ed.* 1016 (1955). See *Emspak v. United States,* 349 *U. S.* 190, 75 *S. Ct.* 687, 99 *L. Ed.* 997 (1955); *Quinn v. United States, supra.* This is not to say that the failure or refusal of a witness to respond to a committee question automatically entails incarceration.

Aside from the presumption of constitutionality which attaches to every statute, 2 *Sutherland, Statutory Construction,* (3d ed. 1943), § 4509, the judiciary has a duty, when confronted with alternative interpretations which

are equally plausible, to adopt the construction which avoids the constitutional issue and sustains the legislative enactment. Mr. Justice Frankfurter described this principle in *United States v. Rumely, supra,* 345 *U. S.,* at *page* 45, 73 *S. Ct.,* at *page* 545, where he said:

"Accordingly, the phrase 'lobbying activities' in the resolution must be given the meaning that may fairly be attributed to it, having special regard for the principle of constitutional adjudication which makes it decisive in the choice of fair alternatives that one construction may raise serious constitutional questions avoided by another. In a long series of decisions we have acted on this principle. In the words of Mr. Chief Justice Taft, '[i]t is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality.' *Richmond Screw Anchor Co. v. United States,* 275 *U. S.* 331, 346, 48 *S. Ct.* 194, 198, 72 *L. Ed.* 303, [308]. Again, what Congress has written, we said through Mr. Chief Justice [then Mr. Justice] Stone, 'must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity.' *Lucas v. Alexander,* 279 *U. S.* 573, 577, 49 *S. Ct.* 426, 428, 73 *L. Ed.* 851, [854], 61 *A. L. R.* 906. As phrased by Mr. Chief Justice Hughes, 'if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell v. Benson,* 285 *U. S.* 22, 62, 52 *S. Ct.* 285, 296, 76 *L. Ed.* 598, [619], and cases cited."

There is nothing in *R. S.* 52:13–3 which expressly or impliedly precludes the right to full judicial review when a witness is charged with the commission of a misdemeanor for refusing to answer a question which a committee deemed proper and pertinent. It is common knowledge that an investigating committee usually, if not invariably, is represented by counsel who undertakes a good deal of the questioning. Quite conceivably, counsel, or one of the committee members, will ask questions which the witness believes exceed the scope of permissible inquiry or invade a privileged area, possibly resulting in a refusal to respond.

Under our interpretation of *R. S.* 52:13–3, the committee must then decide whether it considers the particular query to be proper and pertinent. This function cannot be left to the discretion of counsel or even one of the committee members, if more than one is sitting, because the others

may well disagree and think the question is improper. The statute states the committee itself is to make the determination as to propriety. If the committee decides the witness is right, that particular question or line of inquisition will of course present no issue. But if the committee decides the witness' refusal is unjustified, it may direct him to answer. If the witness remains adamant, then, and only then, the risk arises that he can be prosecuted for a misdemeanor. *Bart v. United States, supra; Emspak v. United States, supra; Quinn v. United States, supra.* Ultimately, the courts will have to decide whether the judgment of the witness or that of the committee was correct.

 On many occasions the sense or spirit of a statute will prevail over the literal, logical, grammatical meaning of the words, if the latter is not in accordance with reason or the principal design of the statute. The most recent expression of the liberal judicial attitude which strives to avoid a narrow, pedantic construction in accordance with the empty principles of rhetoric alone may be found in *Lane v. Holderman,* 23 *N. J.* 304 (1957). See also *DeFazio v. Haven Savings & Loan Ass'n,* 22 *N. J.* 511, 518 (1956); *In re Roche's Estate,* 16 *N. J.* 579, 587 (1954).

*R. S.* 52:13–3 has remained substantially unchanged since 1895. *L.* 1895, *c.* 83, §§ 1 and 2, *p.* 162. It has been involved in litigation several times, and in no case did the reviewing court advert or refer to any unconstitutionality. *In re Kelly,* 123 *N. J. Eq.* 489 (*Ch.* 1938), affirmed *McRell v. Kelly,* 124 *N. J. Eq.* 350 (*E. & A.* 1938); *In re Hague,* 105 *N. J. Eq.* 134 (*Ch.* 1929), affirmed 9 *N. J. Misc.* 89 (*E. & A.* 1930); *In re Hague,* 104 *N. J. Eq.* 31 (*Ch.*), affirmed 104 *N. J. Eq.* 369 (*E. & A.* 1929); *State v. Brewster,* 89 *N. J. L.* 658 (*E. & A.* 1916). (*Eggers v. Kenny, supra,* overruled *In re Kelly* and the second *Hague* case, at 105 *N. J. Eq.* 134, with respect to the restrictions they had placed upon the scope of legislative investigations.) Research shows the common practice has been largely consistent with the interpretation we have given, and we are content to affirm the validity of the statute.

The prosecutor originally insisted that his authorization of wiretap activities did not constitute a violation of *N. J. S.* 2*A*:146–1 since he was acting in the public interest to secure efficient enforcement of the law rather than in a willful and malicious manner.

*N. J. S.* 2*A*:158–5 enjoins the county prosecutors to "use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws," and the plaintiff urges he was merely fulfilling the duties impressed upon him by the statute according to his honest judgment of his responsibilities for the protection of the public.

We do not consider his activities reflect adversely upon either his integrity or ability. Indeed, while we differ with him as to his interpretation of the law, we recognize his motivation was commendable. The practice of wiretapping by other law enforcement officials throughout the State was not uncommon, and a prosecutor might well be under public pressure to adopt methods which had been deemed successful elsewhere.

However, *N. J. S.* 2*A*:146–1 is all-inclusive by its terms. It makes no exception for public prosecutors or any other official charged with law enforcement. Reliance upon *N. J. S.* 2*A*:158–5, which directs the exercise of "lawful" diligence, is not justified.

Within reasonable limitations, the Legislature has the power and the right to designate the mere doing of an act as a crime, even in the absence of the *mens rea* which was a necessary prerequisite at common law. See *State v. Labato,* 7 *N. J.* 137 (1951); *Halsted v. State,* 41 *N. J. L.* 552 (*E. & A.* 1879); *State v. Tracy,* 29 *N. J. Super.* 145 (*App. Div.* 1953); 1 *Wharton, Criminal Law* (12*th* ed. 1932), § 143. Where words clearly indicating the requirement of a criminal intent are omitted, the issue becomes one of statutory construction to ascertain the meaning of the legislative body. See *State v. Kuehnle,* 85 *N. J. L.* 220 (*E. & A.* 1913); *Halsted v. State, supra; State v. Tracy, supra;* 22 *C. J. S., Criminal Law,* § 30. Here, it would

seem that the element of general intent must be proved before a contravention of the wiretapping statute can be established. We should not, however, confuse intent with motive. Proof of motive is never essential to a conviction but may be evidential. 22 *C. J. S., supra,* at § 31(*a*); 1 *Wharton, supra,* at § 156. An accused can steal to prevent his family from starving or kill to rid the community of a menace, but the laudatory qualities of the design do not absolve him from the application of criminal sanctions. 1 *Wharton, supra,* at §§ 137, 155. If it were otherwise, the administration of criminal law would become chaotic, since the prosecution would be compelled to analyze the psyche of each defendant and to prove that, in fact, it was malignant.

The ordained inquiry is whether the act condemned was committed with full knowledge of the facts, in a conscious and purposeful manner, without legal justification or excuse. It must not be the product of inadvertence or negligence or any state of mind other than a free and untrammeled will. This is the definition of criminal intent embodied in the words "willfully and maliciously," as used in this statute. The accused must intend to act in the way proscribed by the statute, but it is immaterial that he does not know or believe his conduct violates the law.

Even positive belief that the act is lawful should not exempt the doer from criminal responsibility. Consciousness of unlawfulness is not essential. 1 *Wharton, supra,* at § 160. If ignorance were a good defense, the administration of the penal law would again depend upon the well-nigh impossible ascertainment of hazy and amorphous mental conditions and opaque logic. When, with a clear knowledge of all the facts, one deliberately and intentionally does an act in violation of a positive law, cognizant of its existence, he cannot be excused on the basis that his animating desire was essentially praiseworthy. See 22 *C. J. S., supra,* at § 30.

The Attorney-General conceded as much during the oral argument, and the annual reports to the Governor of previous attorneys-general reveal a like conclusion that wiretapping

by law enforcement officials is illegal. 1948 *Report to the Governor* by Attorney-General Van Riper; 1953 *Report to the Governor* by Attorney-General Parsons. The Association of County Prosecutors has also manifested the belief that its members may not have the right to tap wires under the provisions of *N. J. S.* 2A:146–1. 1956 *Annual Report of the President to the County Prosecutors' Assn. of New Jersey.*

In addition to his attack upon *R. S.* 52:13–3, several other arguments are advanced by the plaintiff to support the propriety of his refusal to comply with the subpoena *duces tecum* issued by the Committee and his determination not to respond to questions which might be asked pertaining to his authorization of wiretapping. He insists there is a fundamental constitutional right on the part of the executive to withhold, in its discretion, any information from the legislative branch of the government. It is said that in seeking to compel the disclosure of information which the prosecutor has deemed to be confidential, the Committee is transgressing upon the doctrine of separation of powers and actually invading the exclusive province of a coordinate body.

A much more limited issue is also raised with respect to the privilege of a law enforcement officer to refuse to disclose the identity of informers and, incidentally, the contents of their communications. It is said public policy alone should prevent the Committee from requiring the production of information when publication thereof will have a deleterious effect upon the enforcement of criminal laws and the attainment of criminal justice.

Although it appears the judiciary of this State has never granted explicit recognition to the existence of a privilege against disclosure of informers, the privilege, as it originated at early common law, has been adhered to and protected for very practical reasons which courts almost everywhere have uniformly understood and accepted. See 8 *Wigmore, Evidence* (3d ed. 1940), § 2374. Many people would be deterred from giving information, relating to violations of the criminal law, to law enforcement officials by a justifiable apprehension

that those whom they implicated would by some means or other exact reprisals if the source of such information were revealed.

Additionally, it is commonly acknowledged that in our society there is a general aversion to the role of informer, at least in so far as the less heinous crimes are concerned, and such persons are looked upon with some semblance of repugnance. Understandably, citizens would be reluctant to reveal criminal infractions if they were to be exposed and subjected to the unpleasantness and embarrassment which experience indicates would follow.

The authorities generally support the rule protecting the identity of informers upon the ground that disclosure might be harmful to the interests of the government and the public. *Wigmore* cites *Hardy's Trial*, 24 *How. St. Tr.* 99 (1794), where the common-law rule was thus stated:

"* * * but there is a rule which has universally obtained on account of its importance to the public for the detection of crimes, that those persons who are the channel by means of which that detection is made should not unnecessarily be disclosed. * * * My apprehension is that, among those questions which are not permitted to be asked, are all those questions which tend to the discovery of the channels by whom the disclosure was made to the officers of justice; that it is upon the general principle of the convenience of public justice not to be disclosed; that all persons in that situation are protected from discovery * * *."

There, Justice Buller in a separate opinion commented:

"* * * and if you call for the name of informer in such cases, no man will make a discovery, and public justice will be defeated. Upon that ground, therefore, it is that the informer for the purpose of a public prosecution shall not be disclosed."

In the very recent case of *Roviaro v. United States,* 353 *U. S.* 53, 77 *S. Ct.* 623, 627, 1 *L. Ed.* 2d 639 (1957), Mr. Justice Burton wrote:

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. *Scher v. United*

*States*, 305 *U. S.* 251, 254, 59 *S. Ct.* 174, 176, 83 *L. Ed.* 141, [154]; *In re Quarles*, 158 *U. S.* 532, 15 *S. Ct.* 959, 39 *L. Ed.* 1080; *Vogel v. Gruaz*, 110 *U. S.* 311, 316, 4 *S. Ct.* 12, 14, 28 *L. Ed.* 158, [160]. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."

He went on to hold that the privilege against disclosure is not absolute and, when necessary, will be dissolved in the interests of justice for the protection of an accused.

The Committee submits, however, that the court below committed error in classifying wiretappers in the same category as informers, and there seems to be merit in this view. Those who tap wires are mere accessories to the disposition, control and regulation of the mechanical contrivances employed to accomplish that object. Their function is to record telephone conversations in a permanent form and to transmit the substance, so memorialized, to their employers. The person operating the tap acquires information of wrongdoing only as an incident to the pursuit of his primary function. If information of criminal conduct is secured in the form of an admission or evidence of participation, it comes from the mouth of the person whose telephone is tapped and not from the functionary who presides over the mechanical working of the recording process. He is not the originator or source of the information imparted to the agency of the law; he merely complies with instructions received from the police authority. Of course, a wiretapper may also be an informer under certain circumstances, but that is not the factual development here encountered. Those persons who supervised and actually tapped wires for the prosecutor do not come within the classification or category of "informer." The common-law privilege has no applicability to persons who undertake to tap wires in accordance with their employment.

Whether the prosecutor and those who acted for him contravened a federal statute, as well as *N. J. S.* 2A:146–1,

raises another inquiry. Section 605 of the Federal Communications Act forbids the interception and publication of telephone conversations. 47 *U. S. C. A.*, § 605. There exists, however, a considerable controversy over its interpretation. The Department of Justice has apparently taken the position that to constitute a violation of the statute there must be both an interception and a divulgence of the information thereby acquired. Other departments of the government disagree, and there is some authority indicating that section 605 is to be interpreted so as to prohibit interception alone, regardless of whether there is publication of the information thus secured. See, generally, *Donnelly, "Comments and Caveats on the Wire Tapping Controversy,"* 63 *Yale L. J.* 799 (1954).

We are not presently concerned with the federal statute, nor is there need to give our interpretation. Whether the hiring of an outside agency by the prosecutor to tap wires and to return the information acquired constitutes a publication involves a question whose resolution is unnecessary for the decision of this appeal. We note it only to emphasize that even under the federal law the permissibility of the prosecutor's action is doubtful, and the necessity for exercising the privilege of withholding the identity of informants is correspondingly diminished.

The privilege against disclosing the identity of informants and the contents of their communications has no applicability in the case *sub judice*. We conclude there is no valid or lawful reason for adhering to the common-law privilege since, under the circumstances here presented, the wiretapper is not an "informer," and thus the Committee was justified in refusing to regard the prosecutor's assertion of the privilege as valid.

With sole reference to the public policy element of the prosecutor's argument, we do not believe revelation to the Committee of the names which it seeks will harm the public interest in successful law enforcement. The Legislature, as the foremost exponent of the public policy of this State, has condemned the tapping of wires as a method for achieving

the detection and punishment of crime. It has thus interpreted and given expression to the popular will. In its opinion, wiretapping is not an acceptable means of law enforcement nor necessary to protect the common weal. Therefore, there is no need to conceal the identities of wiretappers. Their activities are not lawfully protected, and they should not be shielded so that they can continue to function, unimpeded by any considerations of illegality. The disclosure of the information sought by the Committee will not jeopardize the effectiveness of any of the legally recognized procedures for law enforcement.

Before considering the question of whether the Committee is attempting to derogate the constitutionally ordained separation of powers, it becomes pertinent to define the role which the prosecutor plays in the governmental structure. Despite the fact that the parties to this litigation initially advanced divergent opinions as to the prosecutor's status, their supplemental research and briefs have brought them almost into accord. They agree that the prosecutor enjoys a rather unique status with respect to the traditional division of responsibilities between the executive branch and the Legislature, and the vertical integration of responsibility which normally results therefrom.

The historical development of the office of county prosecutor is interesting and lengthy, and a synopsis of it should prove helpful. At common law in England, the attorney-general was the chief legal representative of the Crown, and in theory his powers of criminal prosecution were almost unlimited. As a practical matter, however, the responsibility for securing enforcement of the criminal laws was left largely in the hands of private parties. See *State v. Winne,* 12 *N. J.* 152, 164–165 (1953). This distinction, if it ever received any recognition in the Colony of New Jersey, perished long before the Revolution, and the attorney-general commonly undertook to prosecute "culprits from minor offenders to murderers." *Journal of the Courts of Common Right and Chancery of East New Jersey,* 1683–1702 (*Edsall* ed. 1937), 3 and *passim.* See *State v. Winne, supra.* Public

prosecution supplanted private prosecution, and, consequently, at the time of the adoption of the *Constitution of 1776*, the first attorney-general of the State of New Jersey possessed and assumed considerable powers of law enforcement.

Apparently, there is no legislation dealing in a general way with the authority of the attorney-general until 1812, with the exception of a law passed in 1795 whereby he was empowered to file an information in the nature of *quo warranto* by leave of the Supreme Court (*Revised Laws of the State of New Jersey, 1703–1820, p. 207,*) and an act passed in the same year authorizing the attorney-general, or an attorney "appointed by the court to prosecute the pleas in his absence," to recover penalties on forfeited recognizances. *Revised Laws, supra,* at 210. In 1812, the Legislature enacted a measure explicitly authorizing the attorney-general "to appoint from time to time, as occasion may require, deputies for those counties of this state which he may be unable in person to attend * * *." *L. 1812, pam.* 23. The preamble to this enactment recites that its passage was motivated by the existence of doubts as to whether the attorney-general could appoint deputies to prosecute the pleas in his behalf when it was impossible for him to do so in person. Each such deputy was to have the same rights, powers and duties as the attorney-general (see our present *N. J. S.* 2*A*:158–5), but it was specifically provided that "nothing herein contained shall prevent the attorney general from acting as such in any of the said counties, at any court which he may attend in person * * *." If neither the attorney-general nor his deputy could attend, any court was given the right to appoint a substitute.

In 1822, by *L. 1822, p. 25,* the Legislature partially repealed the act of 1812 and thereby abolished the right of the attorney-general to appoint a deputy. Instead, the Legislature authorized the Courts of General Quarter Sessions of the Peace in each county to appoint a prosecutor of the pleas in the absence of the attorney-general.

In 1823 the Legislature determined to take upon itself the responsibility for appointing "prosecutors of the pleas."

It repealed the 1822 enactment, except that provision authorizing the courts to appoint a temporary prosecutor for a court term when the attorney-general was absent and where there was no prosecutor, and provided for appointment by the Council and General Assembly in joint meeting. The 1823 act stated the prosecutor should "* * * do and perform such acts and things in behalf of the state, in and about such prosecutions as the said attorney-general might, or ought to do, if he were personally present; * * *." It goes on to provide a five-year term for the prosecutor upon commission by the Governor and to subject him to dismissal, when adjudged guilty of misbehavior, by impeachment. *L. 1823, p. 52.* We find that here for the first time the prosecutor is given a specific term of office and authority to prosecute the pleas on a more or less permanent basis. This is the embryonic emergence of an independent office.

The *Constitution* of 1844 followed the trend by changing the character of both offices. *Art. VII, Sec. II, par. 4,* provided for the appointment of the attorney-general by the Governor with the advice and consent of the Senate for a term of five years. Pursuant to the same provision, the prosecutors were appointed in an identical manner for a like term. To conform with this constitutional change, the Legislature in 1846 repealed the enactment of 1823, providing in the *Revised Statutes of 1846, page 832,* that:

"* * * there shall be appointed for each county some fit person, who shall be an attorney and counsellor at law, whose duty it shall be to prosecute the pleas of the state in such county, in the absence of the attorney general: *and further,* to do and perform such acts and things in behalf of the state, in and about such prosecutions, as the attorney general might or ought to do, if personally present. * * * * * * * * the said prosecutors shall, severally, during the continuance of their appointments, be vested with the same powers, subject to the same penalties, and entitled to the same fees for services, in the absence of the attorney general, within their respective counties, as the attorney general is or shall by law be vested with, or subject or entitled to."

From the unambiguous language of these enactments, we note a gradual modification in the common-law functions of the attorney-general. He retained the authority to prosecute the pleas of any county if he so wished. But the Legislature, first to aid and then to supplement his authority, created the office of the prosecutor to do what the attorney-general "might or ought to do" if he were personally present. Significantly, the Legislature was gradually establishing the prosecutor as an independent authority, not subject to act only on the order of the attorney-general.

In 1854 the Legislature enacted a law which had an important bearing upon both the attorney-general and the county prosecutor. *L.* 1854, *c.* 58, appears to be the first act which specifically defined the over-all powers and duties of the attorney-general and fixed his salary. Section 3 of the act is of paramount importance in the present inquiry. It specifies:

"* * * That after the passage of this act the criminal business of the state shall be prosecuted exclusively by the prosecutors of the pleas, except in counties where, for the time being, there may be no prosecutor, or where the prosecutor desires the aid of the attorney general; and when the attorney general prosecutes in a county having no prosecutor, he shall be entitled to the fees now fixed by law; and where he aids in the prosecution at the request of the prosecutor, he shall be entitled to one-half of the fees; and when the attorney general attends the trial of any case at the request of a justice of the supreme court, or of the board of freeholders, as provided in the first section of this act, he shall be paid such sum for that special service as the justice of the supreme court of that judicial district shall certify and fix, to be paid by the collector of the county in which the cause is tried."

Prior to 1854 the relevant statutes had gradually authorized the prosecutor to exercise increased power within the county. They did not, however, purport to limit or expand the powers of the attorney-general, especially with respect to criminal prosecutions. The 1854 act, on the other hand, restricted the attorney-general to carrying out the criminal business of a county in four situations: (1) in homicide cases, or other high crimes on the written request

of a justice of the Supreme Court; (2) upon request of the board of freeholders; (3) where there was no county prosecutor to attend to the general criminal business in the county; and (4) where the county prosecutor requested his aid.

In essence, *L.* 1854, *c.* 58, forms the basis for the present-day distinction between the jurisdiction and powers of the attorney-general and those of the county prosecutor. After 1854 the powers of the attorney-general to attend to criminal business in the counties were broadened in two instances. By *L.* 1911, *c.* 184, the Legislature supplemented *L.* 1854, *c.* 58, to authorize a justice of the Supreme Court to request the attorney-general, personally or through an assistant, to attend in any county for prosecuting the criminal business of the State,

"* * * including the investigation of alleged crimes and misdemeanors, the attendance before the criminal courts and grand juries of the county, the preparation of indictments and the trial of indictments for crimes and misdemeanors, and upon the like request to represent the State in proceedings on error in criminal cases in the Supreme Court and Court of Errors and Appeals."

While the courts and county authorities could request the attorney-general to handle general county criminal business, it was not until 1944 that the Legislature permitted the Governor to request the attorney-general to encroach upon the area usually exclusively reserved to the prosecutors. Even then, the Governor's powers were limited to particular instances. The Department of Law Act, *L.* 1944, *c.* 20, empowered the Governor to request the attorney-general "* * * [to] attend for the prosecution of a specific investigation or of a particular criminal case * * *."

From this outline of the evolution of the offices of attorney-general and county prosecutor, it is evident that the jurisdiction of the county prosecutor has been carved out of the original powers of the attorney-general. Judicial authority supports this conclusion. See *State v. Longo,* 136 *N. J. L.* 589 (*E. & A.* 1947); *State v. New Jersey Jockey Club,* 52 *N. J. L.* 493 (*Sup. Ct.* 1890); *State ex rel. Clawson v. Thompson,* 20 *N. J. L.* 689 (*Sup. Ct.* 1846).

Thus, we arrive at the presently existing situation under the *Constitution of* 1947, which strongly reaffirms that the prosecutors are largely independent of control by the attorney-general, who may intervene in the criminal matters of the county primarily by way of supersession upon request or as otherwise specifically provided for by statute.

By provision of the *Constitution of* 1947, both the attorney-general and the county prosecutor are constitutional officers. Both are appointed by the Governor with the advice and consent of the Senate. The attorney-general serves a term co-existent in length with that of the Governor, but the county prosecutor serves for five years, or until the appointment and qualification of a successor. The attorney-general, as head of the Department of Law and Public Safety, is within the executive department (*Art.* V, *Sec.* IV, *par.* 3), but the provision for the appointment of prosecutors is found in *Art.* VII, *Sec.* II, *par.* 1, "Public Officers and Employees." These constitutional provisions fail to furnish any guide or standard with respect to the nature of the powers, rights, duties and responsibilities of either officer, and, consequently, the task of definition is left to the Legislature. *E. g., State v. Winne, supra; State v. Longo, supra.*

The Legislature has chosen to continue the relationship substantially as it existed after the passage of *L.* 1854, *c.* 58. Under ordinary circumstances, the attorney-general is not warranted in venturing into the county except upon request, or when there is no county prosecutor, or as otherwise specifically provided by statute. *R. S.* 52:17*A*–4(*f*); *N. J. S.* 2*A*:158–4. There is no ordinary chain of command between the attorney-general and the county prosecutors. *R. S.* 52:17*A*–5 points up the essential independence of the two offices and the disparateness of their powers. After enumerating the special circumstances under which the attorney-general may attend in a county, *R. S.* 52:17*A*–5 provides:

"* * * the Attorney-General and his deputies or assistants shall have all the power and authority of the county prosecutor for

prosecuting the criminal business of the State or such part thereof, including the investigation of alleged crimes and misdemeanors * * *.

Whenever the Attorney-General shall have taken over the duties of a county prosecutor, he shall have all of the authority conferred by law upon the prosecutor, and he may appoint such temporary assistants as he may deem necessary, and shall also have power to appoint such aids, investigators or other personnel and clerical assistants as he shall deem necessary."

In summary, although at common law the attorney-general did in fact possess broad powers over criminal matters, his powers and duties were, and are now, seemingly subject to definition by the Legislature. Such being the case, the Legislature has seen fit to work a pronounced deviation of authority within the executive structure, investing the county prosecutors with a jurisdiction formerly occupied by the attorney-general and largely excluding the latter from conducting criminal business within the various counties. The prosecutor is normally entitled to prosecute the criminal affairs of the State within the county, and without intervention by the attorney-general. *N. J. S.* 2A:158-4. As between the two officers, the prosecutor is usually entrusted with the primal duties of detection, arrest and conviction. *N. J. S.* 2A:158-5. Of course, in reality, there is a close and healthy coordination which should always exist between the two offices.

The potential amplitude of the attorney-general's authority under *R. S.* 52:17A-4(h), which imposes the duty upon him to "[e]nforce the provisions of the Constitution and all other laws of the State, as well as perform all of the duties conferred and imposed by law * * *," remains open for delineation if the occasion should arise, and we do not treat of it here in a definitive manner. In light of the specific provisions of the enactments previously discussed, it is doubtful whether the general phraseology of *R. S.* 52:17A-4(h) imports a close supervisory relationship between the attorney-general and the county prosecutors. In passing, we note that *R. S.* 52:17A-1 describes one of the purposes of the Department of Law Act as being "to

provide for the enforcement of the criminal law of the State by such department where the ends of justice so require," and undoubtedly this provision will have to be taken into consideration if an interpretation of *R. S.* 52:17A–4(h) is ultimately made. Both of these sections are commented upon by Professor Ferguson in *"Formulation of Enforcement Policy,"* 11 *Rutg. L. R.* 507, 521 (*Spring* 1957).

▮▮ Neither does it appear that the Governor is responsible for the daily functioning of the prosecutor's office. By virtue of the provisions of *Art.* V, *Sec.* IV, *par.* 5, of the *Constitution of* 1947, the Governor has removal powers over those employees who receive their compensation from the State, but the prosecutors receive their remuneration from the county.

The Constitution provides "the executive power shall be vested in a Governor" and he "shall take care that the laws be faithfully executed." *Art.* V, *Sec.* I, *pars.* 1 and 11. The means for insuring faithful execution, however, is:

"\* \* \* by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State \* \* \*."

Undoubtedly, in a practical sense, the Governor enjoys a very real authority over the county prosecutors through his powers to supersede them in particular cases. To this extent, at least, the prosecutor's office is not completely divorced from control by the state executive. But the existence of this power of supersession does not bring the prosecutors so directly under the influence of the Governor that they automatically qualify as full-fledged members of the state executive branch.

We are satisfied that the prohibition of *Article* III of the *Constitution of* 1947 does not invalidate the Committee's demand for documentary evidence of the identity of those persons or agencies engaging in wiretapping on behalf of the prosecutor. This article provides:

"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

The essence of the doctrine of separation was described in *Massett Bldg. Co. v. Bennett*, 4 *N. J.* 53, 57 (1950), by Chief Justice Vanderbilt, where he said:

"As we observed in *Mulhearn v. Federal Shipbuilding & Dry Dock Co.*, 2 *N. J.* 356, 363 (1949), the doctrine of separation of powers is not peculiar to New Jersey; it exists in one form or another in almost every American constitution; and it has nowhere been construed as creating three mutually exclusive water-tight compartments. To do so would render government unworkable and the slave of a doctrine that has for its beneficial purpose the prevention of despotism that inevitably results from the concentration of all the powers of government in one person or in one organ of government. So in almost every state we find seeming exceptions to the doctrine from the earliest times to the present day, *Baldwin, The American Judiciary, Chapter* II (1914), some of which are upheld, others of which have been declared unconstitutional. While no rule of thumb will cover all the cases, in general it may be said that no deviation from the constitutional provisions incorporating the doctrine of the separation of powers will be tolerated which impairs the essential integrity of one of the great branches of government."

Here, we have no impairment of the "essential integrity of one of the great branches of government." In truth, we encounter much difficulty in defining with complete exactitude the legal status of the prosecutor in our governmental scheme. But although there is confusion and uncertainty with regard to his status by reason of the fact that his office is created by the Constitution, he is appointed by the Governor with the advice and consent of the Senate, the Legislature prescribes his duties, while he is paid by the county, plus the fact that the freeholders and the assignment judge of the county have general powers of supersedure, there is nevertheless little doubt but that the executive chain of command is not sufficiently prominent to enable the prosecutor to claim any high prerogative which might be enjoyed by the state executive with respect to

withholding information from the Legislature. In fact, the Attorney-General concedes that if the prosecutor is to assert any constitutional right to withhold records or information from the Committee, it must be on the basis of his own unique status and not as a result of any immediate connection with the Governor or Attorney-General.

The prosecutor is primarily a local official. There is no equality in stature or dignity with the Legislature. He cannot claim freedom from properly conducted legislative investigation on the ground that such will subvert the division of powers envisioned by our forefathers as an effective check upon the growth of despotism. The doctrine of separation has little applicability where the competing governmental functions are on entirely different levels of government.

Additionally, the Committee is not basically seeking to exercise any power "properly belonging" to another branch of government. See *Tenney v. Brandhove, supra,* 341 *U. S.,* at *page* 378, 71 *S. Ct.,* at *page* 789. The broad scope of legislative investigatory powers has already been outlined. The fact that the Legislature may unearth particular crimes and disclose the activities of specific individuals in its pursuit of the facts necessary to wise and effective legislation is immaterial and purely incidental. See *Sinclair v. United States, supra,* 279 *U. S.,* at *page* 295, 49 *S. Ct.,* at *page* 272; *McGrain v. Daugherty, supra,* 273 *U. S.,* at *pages* 179–180, 47 *S. Ct.,* at *page* 330. Presumably, the purpose of the Committee is to discover whether its previous legislation against wiretapping is working effectively and whether new legislation of a different character is needed or advisable. The revelation of the identities of those performing wiretapping may well be material to the expedient accomplishment of this purpose. Only by this avenue can the Committee ascertain how widespread and flourishing the practice is. It may possibly develop that some of the persons hired by the prosecutor operate large agencies with much equipment used in making thousands of taps a year. Speculative as this assumption is, it nevertheless reflects the relevance

and importance of the information which the Committee demands.

In this connection, the words of Justice Jacobs in *Eggers v. Kenny*, 15 *N. J.* 107, 119–120 (1954), are especially apt:

"Since then the many pertinent decisions which have been rendered throughout the country have recognized that if the legislative and executive branches of government are to discharge their obligation of meeting fully the threat of widespread crime they must be furnished with adequate information on the subject; it is when they know of existing conditions including the nature of the violations and the extent of official participation therein that they can best determine what legislative and executive steps should be taken for the protection of the public.

\* \* \* This case, as well as the pertinent holding in the second *Hague* case, must now be overruled in order that our State may have the important public benefits of the doctrine that a legislative body may conduct an inquiry in aid of its proper legislative functions even though the subject of the inquiry may also be the proper concern of courts and grand juries in their enforcement of the criminal laws. This doctrine has received almost universal recognition and is applicable equally to state investigating committees and municipal investigating committees acting pursuant to express or implied statutory authority."

As modified to require the disclosure to the Committee of the identities of those outside persons or agencies who performed wiretapping operations for the prosecutor, the judgment below is affirmed, without costs.

JACOBS, J. (concurring). The Senate and General Assembly have the very high responsibility of legislating for the welfare of our people. To discharge that responsibility they need adequate information and suitable avenues for obtaining it. One of the customary avenues is the legislative committee and here it is the "Joint Legislative Committee to Study Wiretapping and the Unauthorized Recording of Speech." That this Committee possesses broad power to compel testimony from public officials as well as others is beyond question. See *Eggers v. Kenny*, 15 *N. J.* 107 (1954); *Const.*, 1947, *Art.* IV, *Sec.* V, *par.* 2; *R. S.*

52:13–3; *N. J. S.* 2*A*:81–17.1. Indeed, the policy through-out our law has generally been to compel relevant testimony from all persons before duly empowered governmental bodies, with the burden on the decliner of showing the applicable privilege or immunity. See *United States v. Bryan,* 339 *U. S.* 323, 331, 70 *S. Ct.* 724, 94 *L. Ed.* 884, 890 (1950). *Cf.* 8 *Wigmore, Evidence* (3*d ed.* 1940), § 2192:

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."

In the instant matter, the Union County prosecutor con-tends that he has the right to refuse to answer any inquiries by the Committee with respect to the wire tapping ac-tivities of his office. He relies on the view that under the constitutional doctrine of separation of powers the executive may, whenever he deems that the public interest so requires, decline to furnish information sought by the legislative or judicial branches of government. *Cf. Thompson v. German Valley R. Co.,* 22 *N. J. Eq.* 111 (*Ch.* 1871). In the federal sphere, many Presidents have strongly asserted their un-limited right to determine what information they may with-hold from Congress, but the judicial authorities supporting them are still far from dispositive. See Bishop, "The Executive's Right of Privacy: An Unresolved Constitutional Question," 66 *Yale L. J.* 477 (1957). In any event, when the right is asserted it is generally considered to be that of the President himself and the executive department heads acting for him. See Wolkinson, *"Demands of Congressional Committees for Executive Papers,"* 10 *Fed. B. J.* 103, 223 (1949) supplemented and reprinted, Department of Justice memorandum, *"Is a Congressional Committee Entitled to*

*Demand and Receive Information and Papers from the President and the Heads of Departments Which They Deem Confidential, in the Public Interest."* In our own State, the Constitution expressly vests the executive power in the Governor. *Art. V, Sec. I, par.* 1. It provides that all executive and administrative departments, including the offices of Secretary of State and Attorney-General, shall be allocated within not more than 20 principal departments and that each principal department shall be under the supervision of the Governor. *Art. V, Sec. IV, par.* 1. The Executive Article (*Art.* V) makes no mention whatever of. the county prosecutor. His office is created in *Article* VII which provides for public officers and employees and simply states that:

"County prosecutors shall be nominated and appointed by the Governor with the advice and consent of the Senate. Their term of office shall be five years, and they shall serve until the appointment and the qualification of their respective successors." *Art.* VII, *Sec.* II, *par.* 1.

In 1944 the Legislature adopted "An Act to establish a Department of Law in the State Government." *L.* 1944, *c.* 20; *R. S.* 52:17A–1 *et seq.* Its purpose as set forth in section 1 was to centralize in one Department the facilities afforded by the State for the rendering of legal services to the Governor and state instrumentalities and "to provide for the enforcement of the criminal law of the state by such department where the ends of justice so require." Section 3 of the act set forth that the Department shall be headed by the Attorney-General and section 4 set forth that the Department shall have the powers and duties vested in the Attorney-General by the Constitution, the statutes and the common law, including the power and duty of enforcing "the provisions of the Constitution and all other laws of the State." See *People ex rel. Castle v. Daniels,* 8 *Ill.* 2d 43, 132 *N. E.* 2d 507 (*Sup. Ct.* 1956); *Commonwealth ex rel. Minerd v. Margiotti,* 325 *Pa.* 17, 188 *A.* 524 (*Sup. Ct.* 1936). Following the adoption of the 1947 Constitution

the Legislature established a principal department in the executive branch to be known as the Department of Law and Public Safety and to be headed by the Attorney-General. The functions of the former Department of Law were duly transferred to the newly created Department of Law and .Public Safety. *R. S.* 52:17*B*–1 *et seq.* In his discussion of the *"Organization and Functions of the Departments in New Jersey State Government,"* Professor Seelbach expressed the view that by virtue of the foregoing enactments the Department now "has general supervision over the twenty-one county prosecutors." 49 *N. J. S. A.* XLIX. And in his recent article on the *"Formulation of Enforcement Policy,"* 11 *Rutgers L. Rev.* 507 (1957), Professor Ferguson had this to say on the relationship between the Attorney-General and the prosecutors:

"The interest of the Attorney-General in the proper enforcement of the criminal law is clear. He has express power to perform the functions of county prosecutor by invitation. But he does so *qua* Attorney-General. His general interest in the administration of criminal law, apart from that pendant to his supersession powers, is revealed by enactments of the legislature. In addition, except where restricted by the Constitution or statute, he is lodged with the common-law powers of his office. Thus, although there is no express statutory grant of a general supervisory power over the county prosecutors, there is no question of the existence of his particular interest *qua* Attorney-General in the enforcement of the criminal law."

The present case furnishes no proper occasion for delimiting the executive's power to withhold information from the legislative, or defining the precise relationship between the Attorney-General and the county prosecutors. The Governor himself has not sought here to exercise any executive right, nor has the Attorney-General as the head of a principal department. On the contrary, the right to withhold information from the legislative is being asserted solely on the prosecutor's behalf without any suggestion that he is acting in fulfillment of any directive from the Governor or the Attorney-General. It seems entirely clear to me that no such independent right is afforded to the prosecutor

by the constitutional doctrine of separation of powers or any other legal principle; whatever be his proper classification he admittedly is neither the executive nor the head of a principal department within the 1947 Constitution. Assuming, for present purposes, that the Governor has the far-reaching right to withhold information from the legislative committee, the public interest strongly requires that the exercise be by him directly or by a principal department head acting for him. The exercise of the power would involve highly delicate governmental considerations and important expressions of executive policy. It would hardly be consonant with principles of sound governmental administration to leave it to the various and perhaps conflicting attitudes of county prosecutors acting wholly without executive direction.

I concur in the affirmance of the Chancery Division's judgment as modified.

WEINTRAUB, J. (dissenting in part). Plaintiff's appeal challenges the validity of *R. S.* 52:13–3. I agree with the majority that the statute should be construed to mean that in a prosecution thereunder it must be established (1) that the committee itself ruled the question to be proper and pertinent and (2) that the question in fact was proper and pertinent, the latter issue being a justiciable one. Thus construed, the statute is constitutional.

The cross-appeal raises an issue of far-reaching significance. It involves the fundamental separation of powers. The reasoning of the majority leads to the proposition that a legislative committee may examine a prosecutor and the records of his office without any restraints other than those to be found in the rules of evidence applicable to a judicial trial, among which is included the so-called informer privilege. Thus a vital arm of the executive branch of government is subjected to the overriding will and decision of the Legislature in a matter of executive responsibility. I cannot subscribe to that view.

## I.

The majority deal with the question whether plaintiff violated the wiretapping statute. *N. J. S.* 2A :146–1 *et seq.* It seems to me that the discussion is gratuitous. The legislative power to inquire in no way depends upon whether plaintiff did or did not violate the act. It is not the province of the Legislature to investigate crime as such. Rather the Legislature may inform itself with respect to any matter pertinent to its functions, and the power to inquire is not augmented or reduced one iota by the criminal or non-criminal quality of the conduct the Legislature wishes to examine.

But the majority having construed the statute, I feel constrained to express my views. *N. J. S.* 2A :146–1 punishes one "who willfully and maliciously" does the forbidden act. The word "maliciously" may denote a wicked and mischievous purpose, or "without just cause or excuse," or both. 26 *Words and Phrases, Maliciously, p.* 287. If "maliciously" be construed to mean "without just cause or excuse," we have little or no guidance as to what the Legislature intended to be a "just cause or excuse"; and the crime being statutory, there is no common-law experience to draw upon. Plaintiff conceived that the enforcement of law constitutes "a just cause or excuse" and refers to his duty under *N. J. S.* 2A :158–5 to "use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." The majority conclude the Legislature did not intend this public duty to constitute "just cause or excuse." It is my belief (or best guess) that this is so, and hence I agree with the majority holding to that effect. But I cannot agree that if plaintiff's criminal liability were in issue, his adherence to a different interpretation can be dismissed as a mere matter of good motive and hence unavailing. The statute requires in any event proof of a *mens rea* as a constituent element of the crime, and on that issue of fact a public official, prior to an authoritative interpretation of a statute which is at least somewhat obscure,

may well assert that his purpose was to discharge his duty as he saw it and hence lacked the consciousness of wrong-doing implicit in "willfully," or a wicked and depraved purpose if such is the meaning of "maliciously." I assume the majority opinion is not to be read to include a finding against plaintiff on that factual issue.

## II.

It cannot be denied that the work of the prosecutor must be protected against disclosures which would jeopardize the interests of government. If a current investigation by his office were exposed to public view, its purpose might be defeated. Persons under investigation would thereby be warned, the state of the case against them would be exposed, and access to additional evidence might be impeded. Investigations which appear to be closed may well be reopened at a later date. A prosecutor's files contain raw, unsubstantiated and unevaluated rumors as well as speculations of the staff. It would be irresponsibility itself to reveal such matters and smear the individuals whom they concern. The prosecutor must depend upon information received under a pledge of confidence, and if his promise is annulled, this indispensable source of information may disappear. Protection must be afforded "against disclosures of the identity of informants, and the method, manner and circumstances of the Government's acquisition of the materials." *Bowman Dairy Co. v. United States,* 341 *U. S.* 214, 221, 71 *S. Ct.* 675, 679, 95 *L. Ed.* 879 (1951). It would seriously impair the efficiency and effectiveness of law enforcement if the prosecutor and his staff must operate with a consciousness that everything they do and say may be laid bare in a public forum.

It is therefore inescapable that the public welfare demands that there repose somewhere a discretion as to what may and may not be disclosed in the public interest. Where does that discretion lie?

I do not question the power of the Legislature to investigate the operations of a prosecutor's office in connection with the legislative function. *McGrain v. Daugherty*, 273 *U. S.* 135, 47 *S. Ct.* 319, 71 *L. Ed.* 580 (1927). But as pointed out in *United States v. Rumely*, 345 *U. S.* 41, 73 *S. Ct.* 543, 97 *L. Ed.* 770 (1953), the informing function of the legislative branch is subject to constitutional limitations. Quoting from an earlier opinion of Mr. Justice Holmes, the court said (345 *U. S.*, at *page* 43, 73 *S. Ct.*, at *page* 545):

"All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached."

Here the power claimed by the committee must be measured against the constitutional provisions allocating the powers of government. *Article* III, *Section* I, of the *State Constitution* provides:

"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

*Article* V, *Section* I, *paragraph* 1 provides that "The executive power shall be vested in a Governor," and *paragraph* 11 reads:

"The Governor shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature."

No principle is more distinctive of our form of government than the separation of powers among the three co-

ordinate branches. The total power to govern is thus distributed with checks and balances to prevent the despotism which anciently was and today still is characteristic of a system in which all power is concentrated in a single authority. It was the purpose of the *Constitution of* 1947 to give full expression to this principle and to eliminate the "diffusion of considerable executive power among the legislative and judicial branches of the government" under the *Constitution of* 1844. *N. J. S. A., Constitution, p.* xvi (1954). Except insofar as the prescribed checks and balances themselves authorize, no branch may directly or indirectly impose its will upon another. It may be claimed and conceded that a given branch could more effectively perform its assigned role if it could exercise or control the discretion vested in the other departments. But we prefer a scheme in which no branch has the duty, power or responsibility to protect the total public interest and in which each branch is accountable only for its own performance within its allotted area.

Chief Justice Marshall said in *Marbury v. Madison,* 1 *Cranch* 137, 165, 2 *L. Ed.* 60 (1803):

"By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience. \* \* \*"

In *Humphrey's Ex'r v. United States,* 295 *U. S.* 602, 629, 55 *S. Ct.* 869, 874, 79 *L. Ed.* 1611 (1935), the principle of separation of powers was expounded in these words:

"The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality. The sound application of a principle that makes one master in his own house precludes him from imposing

his control in the house of another who is master there. James Wilson, one of the framers of the Constitution and a former justice of this court, said that the independence of each department required that its proceedings 'should be free from the remotest influence, direct or indirect, of either of the other two powers.' *Andrews, The Works of James Wilson* (1896) *vol.* 1, *p.* 367. And Mr. Justice Story, in the first volume of his work on the Constitution, *4th ed.* § 530, citing No. 48 of *The Federalist,* said that neither of the departments in reference to each other 'ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers.' "

The issue now before us has appeared and reappeared on the federal scene since President Washington asserted the exclusive executive right to determine what information within his department should be withheld from the Congress in the public interest. In his Farewell Address, he cautioned:

"It is important, likewise, that the habits of thinking in a free country should inspire caution in those intrusted with its administration to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. * * * The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories, and constituting each the guardian of the public weal against invasions by the others, has been evinced by experiments ancient and modern, some of them in our country and under own own eyes. To preserve them must be as necessary as to institute them." 1 *Richardson, Messages and Papers of the Presidents, p.* 219 (1896).

Since then the Chief Executives of the United States have repeatedly adhered to the precedent thus established, and although the right thus claimed has been challenged on the floor of the Congress, it has also been stoutly defended even there. In recent years, the President has asserted this power and responsibility with respect to the subject which here concerns us, to wit, the work of law enforcement officials. Authoritative writers support the executive position. *Taft, Our Chief Magistrate and His Powers, p.* 129 (1925); 3 *Willoughby, Constitution of the United States* (*2d ed.* 1929), *pp.* 1488–90; *Corwin, The President, Office and*

*Powers* (*3d ed.* 1948), *pp.* 136–145. The history of the subject has been recounted in *Wolkinson, "Demands of Congressional Committees for Executive Papers,"* 10 *Fed. B. J.* 103, 223, 319 (1949). See also the opinion of Attorney-General (later Mr. Justice) Jackson, 40 *O. A. G.* 45 (1941), and *Bishop, "The Executive's Right of Privacy: An Unresolved Constitutional Question,"* 66 *Yale L. J.* 477 (1957).

Enforcement of the law is a vital executive function and responsibility. To repeat from *Humphrey,* the executive must be "entirely free from the control or coercive influence, direct or indirect, of either of the other[s]" branches in the performance of that function. "The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there," and the executive "should be free from the remotest influence, direct or indirect, of either of the other two powers." I cannot square the majority opinion with these fundamentals.

It must be remembered that the range of legislative inquiry is virtually boundless, for it is difficult to conceive of any inquiry which could be judicially condemned as unrelated to a legislative function. Nor can we inquire into the motives of the individual legislators in their exercise of a power which is constitutionally theirs. If the Legislature has an unrestricted power to investigate the operation of a co-equal branch, co-equality would disappear, for the Legislature could sit in virtual superintendence of the other branch. If the Legislature could thus investigate the executive's enforcement of law, the executive would cease to "be free from the remotest influence, direct or indirect," of the Legislature; he would, in fact, be subject to direct interference in the discharge of his constitutional function, for, as pointed out above, the public disclosure of the files, techniques, and channels of communication must surely impede and impair effective enforcement of law. It must therefore be the sole and exclusive duty and responsibility of the executive to determine what information

within the executive department must be withheld to safeguard the public weal. For an improper exercise of that discretion, the executive is accountable to neither the Legislature nor the judiciary, but rather, in the words of *Marbury,* he "is accountable only to his country in his political character and to his own conscience."

One may fretfully conceive of a total prostration of government for want of cooperation in the discharge of divided authority. But our system has worked for more than 150 years. There are built-in pressure points to which resort may be had to encourage mutual assistance. The legislative branch is amply equipped to hold its own. It has the power of life and death over non-constitutional offices and controls the appropriation of money. The Senate has the power of confirmation. Moreover, it is the public obligation of the coordinate branches to coordinate, and the required statesmanship has rarely been lacking. And perhaps above all, there is accountability and responsiveness to public opinion. I have no doubt that all of the forces combine to assure the transmission to legislative committees of whatever intelligence they really need. The approach of one branch to another cannot be compulsive without resulting in the very concentration of power which our Constitution is designed to prevent.

There is a tendency to pass all controversies to the judiciary, and so it is suggested here that the court decide what confidential material may be divulged with public safety. But the same principle of separation of powers forbids the judiciary to exercise a discretion vested in the legislative or executive branch, or to review an exercise of that discretion in an area which is purely political and does not involve the rights or liabilities of a litigant.

We must distinguish what is before us, namely, a controversy as to the *situs* of a power of government as between two coordinate branches in the discharge of their respective functions, from a judicial proceeding in which a litigant seeks the confidential material in order to defend or prosecute a case. The difference is fundamental, and was noted

by Chief Justice Marshall in *Marbury v. Madison, supra* (1 *Cranch,* at *page* 166) when he said of the exercise of power by officers acting for the President:

"In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, the decision of the executive is conclusive. * * *"

It is only when the exercise of executive discretion affects "individual rights" that the judiciary in discharge of its allotted role may consider whether to review it. Hence, where a litigant needs information which the executive believes to be confidential, the judiciary may be obliged to weigh the respective rights and interests of the litigant and the State in determining whether to accept the executive decision. Such was the situation in *Roviaro v. United States,* 353 *U. S.* 53, 77 *S. Ct.* 623, 1 *L. Ed.* 2d 639 (1957); *United States v. Reynolds,* 345 *U. S.* 1, 73 *S. Ct.* 528, 97 *L. Ed.* 727 (1953); *United States ex rel. Touhy v. Ragen,* 340 *U. S.* 462, 71 *S. Ct.* 416, 95 *L. Ed.* 417 (1951); *Scher v. United States,* 305 *U. S.* 251, 59 *S. Ct.* 174, 83 *L. Ed.* 151 (1938); *Boske v. Comingore,* 177 *U. S.* 459, 20 *S. Ct.* 701, 44 *L. Ed.* 846 (1900); see generally, *Annotations,* 95 *L. Ed.* 425 (1951) and 97 *L. Ed.* 735 (1953).

But where, as here, the right of a litigant to information is not involved, and the question is which of the other branches of government, as between themselves in the performance of their respective political duties, has the final say as to disclosure of executive secrets, the judiciary cannot go beyond deciding the *situs* of that governmental discretion. It cannot lie with the judiciary itself to make the policy determination or to review a determination by the branch which has the power, for otherwise the judiciary would place itself in a position of supremacy in an equally inadmissible breach of the doctrine of separation of powers. This, I believe, is what the majority undertake to do. They make

a policy decision for the other branches that security be maintained solely as to informers. The identity of informers is but one phase of the total executive privilege. I can find no constitutional basis for a judicial delineation as to what security should or should not be maintained as between the other branches of government.

Thus I must quarrel with the majority's statement:

"With sole reference to the public policy element of the prosecutor's argument, we do not believe revelation to the Committee of the names which it seeks will harm the public interest in successful law enforcement."

It is not within the power of the court to consider that question. And I add, not by way of joining in that inquiry, that revelation of the names of the wiretappers may have the effect the majority cannot find, for if the wiretappers are revealed and interrogated, the identity of individuals under investigation and information obtained against them may be revealed, and such disclosure may even serve to enable the suspects to identify the informers against them. I have no way of knowing the ultimate impact, nor have I the right to inquire.

Each branch of government has phases of operations which are confidential. The required security is part and parcel of its basic function and indispensable for the successful discharge of its assigned constitutional role. The principle of separation of powers forbids one branch to invade the other and exercise or review the exercise of the discretion reposed in it. The sole area for any exception is a judicial controversy in which a litigant needs the information, and that is not the case before us.

## III.

The majority conclude that a prosecutor may exercise the executive power of non-disclosure as to informers, but otherwise finds the discretion resides in a legislative committee. I cannot find a logical basis for this dichotomy. The ma-

jority seem to isolate the prosecutor from the full executive privilege because (a) his office is not placed within the immediate control of the Governor or attorney-general and (b) "The prosecutor is primarily a local official."

The second basis is dissipated elsewhere in the majority opinion itself. The prosecutor's office was in effect carved out of the attorney-general's office. The prosecutor represents the State in the prosecution of the criminal business of the State and in the enforcement of law; and in the exercise of his duties he possesses the authority theretofore in the attorney-general and still in the attorney-general when the latter undertakes to handle law enforcement within a county. The prosecutor thus performs an executive function of the State and is the State's chief representative in such matters within the county. That he is a state officer, and not a county official, is perfectly evident to me. There can be no doubt that he is subject to impeachment as a state officer under *Article* VII, *Section* III, *paragraph* 1 of the *Constitution*. *State v. Winne*, 12 *N. J.* 152 (1953).

The record of the proceedings of the Constitutional Convention does not disclose why the prosecutor's office does not appear in the Executive Article. Whatever the reason, he surely is not in the legislative or judicial departments. Since he exercises executive power, he must fall within the executive branch. The most one can gather from the Constitution or its history is that the Convention decided to assure a degree of independence even from the head of the executive department and to that end gave the prosecutor a term of office which does not coincide with the Governor's tenure. I fail to understand how this constitutional treatment can be said to evince a purpose to vest in the Legislature the power to exercise an executive discretion as to disclosures of confidential matters and with it the capacity to interfere with the performance of an executive function. If the exercise of that power by the Legislature would constitute an invasion of the executive branch when law enforcement is in fact handled by the attorney-general, the invasion

can be no less offensive to the doctrine of separation of powers because the State's representative is the prosecutor.

It seems to me that a proper interpretation of the Constitution places in the executive department the ultimate discretion as to disclosure of executive confidences. This follows from the very principle of separation. And since the relations between branches of government are involved, the Governor, as head of the executive department, must have the ultimate power within his department to decide whether a disclosure should be made to a coordinate branch, which power he may himself exercise or delegate to his cabinet officer, the attorney-general. Until the Governor acts, the prosecutor, as the chief representative of the State in this executive function, must himself have the necessary discretion, and where a prosecutor conceives that the public interest forbids disclosure, the proper course is for the Legislature or its committee to address a request for the information to the Chief Executive of the State.

I would modify the judgment accordingly.

JACOBS, J., concurring in result.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For modification (dissenting in part)*—Justice WEINTRAUB—1.