

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-1999

# Carter v. City of Philadelphia

Precedential or Non-Precedential:

Docket 98-1581

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Carter v. City of Philadelphia" (1999). *1999 Decisions.* Paper 112.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/112

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 28, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1581

RAYMOND CARTER,

      Appellant

v.

CITY OF PHILADELPHIA; THOMAS RYAN, INDIVIDUALLY
AND AS A POLICE OFFICER FOR THE CITY OF
PHILADELPHIA; JOHN DOE, AN UNKNOWN POLICE
OFFICER(S) AND OR DETECTIVE(S) FOR THE CITY OF
PHILADELPHIA; LYNNE ABRAHAM, PHILADELPHIA
DISTRICT ATTORNEY IN HER OFFICIAL CAPACITY;
RICHARD ROE, POLICE OFFICER REPRESENTING
UNKNOWN EMPLOYEES OF THE PHILADELPHIA
DISTRICT ATTORNEY'S OFFICE, IN THEIR INDIVIDUAL
AND OFFICIAL CAPACITY; WAYNE SETTLE,
INDIVIDUALLY AND AS A POLICE OFFICER FOR
THE CITY OF PHILADELPHIA; MICHAEL DUFFY,
INDIVIDUALLY AND AS A POLICE OFFICER FOR
THE CITY OF PHILADELPHIA

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-cv-04499)
Before: Honorable Bruce W. Kauffman

Argued
March 10, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges.

(Filed April 28, 1999)

Robert W. Small, Esquire (ARGUED)
Berlinger & Small
1494 Old York Road
Suite 200
Abington, PA 19001

 Of Counsel:
 Susan F. Burt, Esquire
 Berlinger & Small
 North American Building,
  11th Floor
 121 South Broad Street
 Philadelphia, PA 19102

 COUNSEL FOR APPELLANT

Marcia Berman, Esquire
City of Philadelphia Law Department
1515 Arch Street
One Parkway Building, 17th Floor
Philadelphia, PA 19102

 COUNSEL FOR APPELLEE
 CITY OF PHILADELPHIA

R. David Walk, Jr., Esquire
 (ARGUED)
Bebe H. Kivitz, Esquire
Kevin J. Kotch, Esquire
Chonda Jordan Nwamu, Esquire
Hoyle, Morris & Kerr
1650 Market Street
4900 One Liberty Place
Philadelphia, PA 19103

Emily Zimmerman
Chief, Civil Litigation Unit
District Attorney's Office
1421 Arch Street
Philadelphia, PA 19201

 COUNSEL FOR APPELLEE
 RICHARD ROE

2

Calvin R. Koons, Esquire
Office of the Attorney General
 of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

 COUNSEL FOR COMMONWEALTH
 OF PENNSYLVANIA AMICUS
 APPELLEE

Stuard B. Suss
Deputy District Attorney
Ralph A. Germak
President, Pennsylvania
 District Attorneys Association
PDAA/PDAI Headquarters
2929 North Front Street
Harrisburg, PA 17110

 COUNSEL FOR PENNSYLVANIA
 DISTRICT ATTORNEYS
 ASSOCIATION AMICUS CURIAE

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal we must first determine whether our requirement that a district court provide a brief statement of reasons in certifying a judgment for appeal pursuant to Fed. R. Civ. P. 54(b) precludes our exercise of jurisdiction to hear the appeal where we are otherwise able to ascertain the propriety of the certification from the record. Exercise of jurisdiction and consideration on the merits in turn require that we decide, as a matter of first impression, whether Pennsylvania's Eleventh Amendment immunity extends to Philadelphia District Attorneys for claims arising from administrative and policymaking – rather than prosecutorial – functions. We must also determine whether, if sovereign immunity does not apply, the official capacity claims are alternatively barred by absolute prosecutorial immunity. Finally, we must consider whether claims against unknown policymakers in the Philadelphia District

Attorney's Office in their personal capacity have been adequately pled.

The Philadelphia District Attorney's Office contends that because the DA's Office acts in the name of the Commonwealth and carries out a sovereign function, it is entitled to share in the Commonwealth's sovereign immunity as an arm of the state. The District Court accepted this contention, holding that application of the factors by which we determine Eleventh Amendment immunity weighed "strongly in favor of finding that the District Attorney's Office, when performing its historic functions of investigating and prosecuting crimes on behalf of the Commonwealth, is an `arm of the state' not subject to suit in federal court without its consent." [1] The District Court further dismissed claims against unknown policymakers in the DA's Office in their personal capacity for failure to state a cause of action under 42 U.S.C. S 1983.

Because we find that the consequences of the District Court's failure to provide a statement of reasons need not be visited on the parties by delaying resolution of their case when the ripeness of the appeal is apparent, we will exercise jurisdiction. On the merits, we find that (1) the performance of an essential sovereign function does not of itself give rise to state surrogate status under Pennsylvania law; (2) a correct application of the factors we set forth in Fitchik v. New Jersey Transit Rail Operations, 873 F.2d 655 (3d Cir. en banc), cert. denied, 493 U.S. 850 (1989), compels a finding that the Commonwealth's sovereign immunity does not encompass the DA's Office; and (3) even if the DA's Office were entitled to sovereign immunity as a state actor during the performance of its prosecutorial functions, such immunity would not extend to the local office administrative, investigative and management functions which underlie this action. We will, therefore, reverse the District Court's holding that the DA's Office is entitled to sovereign immunity for purposes of the claims at hand. We reject the alternative assertion of absolute prosecutorial immunity as lacking merit where the cause of

_____

1. Carter v. City of Philadelphia, 4 F. Supp. 2d 386, 393 (E.D. Pa. 1998).

4

action lies on administrative and investigative, rather than prosecutorial, conduct. Finally, because we find that the section 1983 claims against unknown policymakers in the DA's Office in their personal capacities have been adequately pled and Carter should be allowed to pursue discovery, we will also reverse the District Court's dismissal of those claims.[2]

I. FACTUAL BACKGROUND

Raymond Carter had been convicted of murder and had served ten (10) years of a life sentence without possibility of parole before his conviction was overturned and the case against him nol prossed following disclosures of long-standing corruption within Philadelphia's 39th Police District.[3] Carter then brought an action against the City of Philadelphia, named police officers,[4] unknown employees of the Philadelphia Police Department, and unknown policymakers within the Philadelphia DA's Office.[5]

Carter's action against individuals in the DA's Office was premised on their failure as administrators to establish training, supervision and discipline policies which would

_____

2. The District Court declined to exercise supplemental jurisdiction over Carter's state law claims when factually related federal claims remained pending against other defendants. Because we will reverse the District Court's dismissal of Carter's federal claims against the DA's Office, we need not address whether this was consistent with the sound exercise of judicial discretion.

3. During disclosures of police misconduct uncovered during an investigation of that district, it came to light that the single eyewitness's testimony placing Carter at the murder scene – the testimony on which his conviction rested – was purchased by a 39th District officer, Thomas Ryan, from a prostitute-informant (Ms. Jenkins) with whom Ryan was intimate. In subsequent proceedings, Ryan was convicted of obstruction of justice and Jenkins admitted her perjured testimony. There was no forensic evidence linking Carter to the crime scene and Carter maintains his innocence.

4. Carter names Thomas Ryan, Wayne Settle, and Michael Duffy individually and as police officers for the City of Philadelphia.

5. Carter brings a section 1983 action, together with various state causes of action, against the defendants.

5

have (a) prevented or discouraged Philadelphia police officers from procuring perjurious "eyewitnesses" and (b) alerted assistant district attorneys to the falsity of such information and prevented its introduction as evidence.[6] The District Court dismissed all claims against the DA's Office, concluding that those defendants were "state officials" and therefore immune from suit for acts in their professional capacity by virtue of the Eleventh Amendment.[7] It further concluded that Carter had failed to state a cause of action against those defendants in their personal capacities. Finally, it declined to exercise supplemental jurisdiction over Carter's state law claims. The District Court subsequently entered a revised order rendering the judgment final pursuant to Rule 54(b),[8] but neglected to set forth specific findings in support of its decision to grant 54(b) certification, despite our express direction in previous cases that district courts do so.

## II. JURISDICTION

Ordinarily, an order which terminates fewer than all claims, or claims against fewer than all parties, does not constitute a "final" order for purposes of appeal under 28 U.S.C. S 1291. Fed. R. Civ. P. 54(b), however, provides that such an order may be final and immediately appealable under S 1291 when the district court makes an express determination that there is no just cause for delay and expressly directs entry of final judgment.[9] We consistently

_____

6. Carter also alleges that the DA's Office failed to disclose exculpatory evidence found in its post-conviction investigation.

7. The District Court framed the question before it as "[w]hether the District Attorney's Office, when performing its investigatory and prosecutorial functions, is an `arm of the state' under the Eleventh Amendment." Carter, 4 F. Supp. 2d at 390.

8. The order states that "[p]ursuant to Rule 54(b) . . . , the Court finds that there is no just reason for delay and, accordingly, directs that final judgment be entered in favor of [the DA's Office] and against Carter on all claims . . . ."

9. When more than one claim for relief is presented in an action, . . ., or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the

require that district courts provide a statement of reasons when entering final judgment under Rule 54(b). See, e.g., Waldorf v. Shuta, 142 F.3d 601, 610-11 (3d Cir. 1998); Anthius v. Colt Industries Operating Corp., 971 F.2d 999, 1003 (3d Cir. 1992); Metro Transportation Co. v. North Star Reinsurance Co., 912 F.2d 672, 677 (3d Cir. 1990); Cemar, Inc. v. Nissan Motor Corp., 897 F.2d 120, 123 (3d Cir. 1990).10 We have remanded cases in which a district court's failure to provide the reasons supporting its exercise of discretion renders us "unable to conclude that the granting of the Rule 54(b) certification was proper."11 We have not had occasion to address the result when, notwithstanding the absence of the required explanation, the propriety of appeal under 54(b) is apparent to the reviewing court on the record.

_____

claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for entry of judgment . . . .

Fed. R. Civ. P. 54(b).

10. Our requirement that a district court accompany a Rule 54(b) certification with a statement of the reasons comes from our "endorse[ment]" and "incorporati[on]", in Allis-Chalmers Corp. v. Philadelphia Elec. Co., 521 F.2d 360, 364 (3d Cir. 1975), of the Second Circuit's

suggest[ion] to the district courts that . . . it would be helpful to [the
appellate court] in reviewing the exercise of discretion in granting a
Rule 54(b) certification if the court . . . would make a brief reasoned
statement in support of its determination that `there is no just
reason for delay' and its express direction for`the entry of a final
judgment . . .' where the justification for the certification is not
apparent.

Gumer v. Shearson, Hammill & Co., 516 F.2d 283 (2d Cir. 1974) (quoted in Allis-Chalmers, 521 F.2d at 364) (emphasis added).

11. Allis-Chalmers, 521 F.2d at 357; see also Cemar, 897 F.2d at 122 (noting that "[b]ecause the reason for the Rule 54(b) certification [was] not
apparent from the record", we required "a statement of reasons by the district court in order to determine the juridical concerns [were] met by its determination that no just reason remains for delay") (emphasis added).

Other courts of appeals have held that a district court's failure to state the reasons for its Rule 54(b) certification does not pose a jurisdictional barrier to appeal. The prevailing rule is perhaps best expressed in Bank of Lincolnwood v. Federal Leasing, Inc., 622 F.2d 944 (7th Cir. 1980):

> [Articulation of the considerations underlying the district court's discretionary certification] constitutes the "better practice," and the failure to provide a written statement of reasons may in an appropriate case lead to a remand for such a statement.
>
> The statement is, however, primarily an aid to the appellate court to permit it to review the exercise of the trial court's discretion. The failure of the district court to make a written statement at the time it makes a 54(b) certification is not a jurisdictional defect, . . . and need not occasion even a remand if the basis for the district court's determination is otherwise apparent.

Id. at 948–49.12

---

12. See also, e.g., Feinstein v. Resolution Trust Corp., 942 F.2d 32 (1st Cir. 1991) (holding that appellate jurisdiction attached notwithstanding district court's failure to state reasons for certification where justification was apparent and sufficient); Pension Ben. Guar. Corp. v. LTV Corp., 875 F.2d 1008 (2d Cir. 1989) (holding court of appeals had jurisdiction although district court did not provide reasoned explanation for certification where it was clear explanation could easily be provided and interest of sound judicial administration favored expeditious resolution of conflict); Kelly v. Lee's Old Fashioned Hamburgers, Inc., 908 F.2d 1218 (5th Cir. 1990) (holding appropriate certification of order dismissing all claims against one defendant where order and record taken together signaled district court's conclusion that requirements of the rule had been met); Fuller v. M.G. Jewelry, 950 F.2d 1437 (9th Cir. 1991) (holding that 54(b) certification did not have "jurisdictional defect" merely because district court did not include specific findings regarding appropriateness of certification); Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162 (11th Cir. 1997) (explaining that where reasons for entry of separate judgment for fewer than all parties or claims are obvious, and remand would result only in unnecessary delay in appeal process, the court of appeals will not require explanation; but when the sound basis for certification is not obvious, the court must dismiss the appeal for lack of final judgment). Cf. Corrosioneering, Inc. v. Thyssen Environmental Sys., 807 F.2d 1279 (6th Cir. 1986) (stating that in absence of reasons for certification no deference will be given to decision to certify and reviewing propriety of certification de novo).

Although we have not yet addressed whether an appeal may go forward when, notwithstanding the absence of the required explanation, the propriety of certification under Rule 54(b) is apparent on the record, we have previously indicated that we share the prevailing view. See supra note 11. In our recent decision in Waldorf, however, we indicated that we had dismissed an earlier appeal "for want of jurisdiction" because the district court failed to "provide a written opinion outlining its reasons for certification". 142 F.3d at 611. See also Anthius v. Colt Industries Operating Corp., 971 F.2d 999 (3d Cir. 1992) (indicating that certification without explanation is not "competent" and we were therefore "obliged to dismiss").13

Assuming that sufficient justification for certification may be discerned from the record in the present case, the Allis-Chalmers, Waldorf and Anthius cases are distinguishable because due to their complexities we were unable to conclude that certification was proper absent explication by the district court.14 In none of these cases was there any

_____

13. This interpretation may follow from Allis-Chalmers's holding that the 54(b) certification "must be vacated because of the failure of the court to
articulate reasons for the certification," 521 F.2d at 361, and from its statements that "[a] proper exercise of discretion under Rule 54(b) requires the district court to do more than just recite the 54(b) formula,"
and that "we incorporate [the giving of a brief reasoned statement] as a requirement for all Rule 54(b) certifications," id. at 364. But see Bank of
Lincolnwood, 622 F.2d at 949 (citing Allis-Chalmers, 521 F.2d at 367 n. 16 "(remanding case for a statement of reasons)" for the proposition that failure to provide a written explanation with certification is not a jurisdictional defect).

14. See Allis-Chalmers, 521 F.2d at 365 (concluding that absent petitioner's demonstration of unusual or harsh circumstances, the presence of a counterclaim "weighed heavily" against the district court's grant of certification); Waldorf, 142 F.3d at 611-612 (discussing complexity of case and potential interrelationship of claims and cross-claims); Anthius, 971 F.2d at 1003 n.3 (stating that court's "familiarity with the issues and arguments" makes it "question whether there could ever be a proper exercise of judicial discretion which would result in an `entry of final judgment' certification under Fed. R. Civ. P. 54(b)").

It should be noted that the holding of Allis-Chalmers as to the significance of counterclaims was rejected by the Supreme Court in Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1 (1980).

indication that the majority believed the propriety of the certification was apparent but that the appeal must nonetheless be dismissed.15 Consequently, any suggestion in the language of these cases that the Allis-Chalmers statement-of-reasons requirement deprives us of appellate jurisdiction where the propriety of the district court's certification is determinable from the record is, at most, dicta. That question remains open for our decision.

A rule requiring remand or dismissal even when the propriety of immediate appeal is apparent would not optimally balance the competing concerns that must inform our interpretation of Rule 54(b). See Curtiss-Wright, 446 U.S. at 2, 100 S. Ct. at 1462 (explaining that decision to certify must take into account the interests of sound judicial administration and the equities involved); Allis-Chalmers, 521 F.2d at 363 ("The rule attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties."); see also Waldorf, 142 F.3d at 608 (observing that question in certification is whether the issue was "ready for appeal . . . tak[ing] into account judicial administrative interests as well as the equities involved").

In view of these concerns, Allis-Chalmers's requirement of a statement of reasons in every case stands not as a jurisdictional prerequisite but as a prophylactic means of enabling the appellate court to ensure that immediate appeal will advance the purposes of the rule.16 It follows

_____

15. Cf. Curtiss-Wright Corp. v. General Elec. Co., 599 F.2d 1259, 1261 (3d Cir. 1979) (Gibbons, J., dissenting) (noting that his dissent in Allis-Chalmers was directed to the majority's "unprecedented and unwarranted imposition of a `statement of reasons' requirement in a case where the justification for certification was[in J. Gibbons's opinion] glaringly apparent on the face of the record").

16. Indeed, as we acknowledged in Allis-Chalmers in "endors[ing]" Gumer, the purpose of the appellate courts' first suggestion – in 1974 – that district courts provide an explanation "where the justification for the certification is not apparent" was to facilitate appellate review in its threshold jurisdictional inquiry. See Gumer, 516 F.2d at 284, 286; Allis-Chalmers, 521 F.2d at 364 ("It is essential .. . that a reviewing court have some basis for distinguishing between well-reasoned conclusions . . . and . . . approval . . . unsupported by evaluation of the facts or analysis of the law . . . .") (quoting Protective Committee v. Anderson, 390 U.S. 414, 434 (1968)).

that the absence of an explanation by the district court does not pose a jurisdictional bar when the propriety of the appeal may be discerned from the record.

Therefore, to the extent Allis-Chalmers or a subsequent case may be read to have suggested (in dicta) that our mandatory statement-of-reasons requirement in Rule 54(b) certifications stands as a jurisdictional bar prohibiting appellate review even where the propriety of the certification is apparent from the record, we now clarify that the better reading of Allis-Chalmers is that although it is always the best practice for district courts to explain a decision to certify a judgment for appeal and we require them to do so, their failure to meet this directive need not result in dismissal or remand where judicial economy – which is the purpose of the finality requirement of S1291, as implemented in Rule 54(b)17 – would not be served.18 Accordingly, we will proceed to reach the merits on appeal when a sufficient basis for a district court's certification is otherwise apparent.19

Here, despite the District Court's inadvertence, the requirements of Rule 54(b) are clearly met. This case

_____

17. See, e.g., Curtiss-Wright, 446 U.S. at 10 (identifying the "interest of
sound judicial administration" as the standard against which a district court's 54(b) certification is to be judged).

18. Cf. Kelly, 908 F.2d at 1220 ("[r]ejecting a `form-over-substance' approach that `would not significantly advance the purposes of Rule 54(b) . . .' " in holding sufficient certification based on record) (quoting
Crowley Maritime Corp. v. Panama Canal Comm'n, 849 F.2d 951, 953 (5th Cir. 1988)); St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 694 (2d Cir. 1989) (noting that purpose of Rule 54(b) is served by exercise of jurisdiction where justification for certification is clear on
record). As the Court of Appeals observed in Kelly, Fed. R. Civ. P. 1 directs that the rules be "construed to secure the just, speedy and inexpensive determination of every action." 908 F.2d at 1221.

19. This interpretation of Allis-Chalmers is consistent with the approach to Rule 54(b) certifications directed by the Supreme Court in Curtiss-Wright. As discussed supra note 14, Curtiss-Wright rejected our previous conclusion that the existence of a counterclaim will ordinarily defeat certification. That decision reflects the Supreme Court's general disapproval of inappropriately restrictive views of Rule 54(b) certification,
and it counsels us to remain mindful of the competing concerns.

unquestionably involves multiple claims and parties; the decision below was a "final judgment" in the sense that it was an "ultimate disposition" of Carter's claims against the DA's office. See Curtiss-Wright, 446 U.S. at 7. The only real question is whether there is any just reason for delaying appeal until disposition of Carter's claims against the remaining defendants. The Supreme Court has interpreted this requirement as balancing considerations of judicial administrative interests (preservation of the federal policy against piecemeal appeals) and equities (justice to the litigants). See id., 446 U.S. at 8. Factors to be considered therefore include "whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined[is] such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." Id. Here, the issue presented is plainly separable and there is no real risk of duplicative appeals, as the Eleventh Amendment defense which was the basis of the District Court's dismissal of claims against the DA's Office is not asserted to be applicable to any of the remaining defendants.20 On the other hand, denial of an immediate appeal may pose a substantial risk that the District Court and the parties will be forced to undergo duplicative trials. Thus, on balance, the interests of judicial economy favor hearing the appeal. Finally, the importance of the issue presented by this appeal also militates in favor of our prompt consideration. Remand to the District Court for technical compliance at this time, when justification is already apparent, would unduly delay the proceedings.

Therefore, although we adhere to our consistent requirement that the district courts provide a brief statement of reasons in certifying a judgment for appeal pursuant to Rule 54(b) in this and in every case, we nevertheless hold that we have jurisdiction to hear this

_____

20. Although there may be some factual overlap between the issues in this appeal and those in a potential future appeal concerning qualified immunity of the remaining defendants, the same issues are not likely to be presented. It is generally recognized that complete legal or factual distinction is not necessary to 54(b) certification. See 10 C. Wright & A. Miller, Federal Practice and Procedure,S 2657 at 50-54.

12

appeal because we are able to ascertain the propriety of the Rule 54(b) certification from the record. To hold otherwise would undermine the policies which Rule 54(b) seeks to advance.

III. ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Despite its language, the Supreme Court has consistently interpreted the Amendment to immunize an unconsenting state "from suits brought in federal courts by her own citizens as well as by citizens of another state." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984) (quoting Employees v. Missouri Dept. Of Public Health and Welfare, 411 U.S. 279, 180 (1973)). In addition, a suit may be barred "even though the state is not named a party to the action, as long as the state is the real party in interest." Fitchik, 873 F.2d at 658 (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)) (emphasis added).

Eleventh Amendment immunity is an affirmative defense and the burden is thus on the DA's Office to establish its immunity from suit. See Christy v. Pennsylvania Turnpike Commission, 54 F.3d 1140, 1144 (3d Cir. 1985) ("[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability."). We determine Eleventh Amendment immunity by examining the evidence on three factors: (1) the source of funding – i.e., whether payment of any judgment would come from the state's treasury, (2) the status of the agency/individual under state law, and (3) the degree of autonomy from state regulation.21 See Fitchik, 873

_____

21. The DA's Office asserts that a fourth factor was later added by the Supreme Court in Hess v. Port Authority Trans–Hudson Corp., 513 U.S. 30 (1994) – viz., whether the functions at issue are "typically state or unquestionably local". The Hess Court did not adopt this distinction as a criterion for determining state status: it did not adopt or formulate any
test. Indeed, the Court concluded that this purported "fourth factor" did not advance its inquiry. See Hess, 513 U.S. at 45. Moreover, to the extent that the distinction may be relevant, it appears to be subsumed within Fitchik's "status under state law" test.

F.2d 655.22

Although the District Court applied the appropriate three factors, it erred both in its analysis of the individual factors, and in their balancing:

(1) Funding — The DA's Office acknowl edges that it is funded by the City of Philadelphia and that the funds for any judgment against it would come from the City. 23 We have twice held en banc that the three Fitchik factors are not weighed evenly and that the "most important" question in determining Eleventh Amendment immunity is "whether any judgment would be paid from the state treasury." Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807, 816 (3d Cir. 1991); Fitchik, 873 F.2d at 659. As we explained in Christy,"[t]he special emphasis we place upon the funding factor is supported by the Eleventh Amendment's central goal: the prevention of federal court judgments that must be paid out of the state's treasury." 54 F.3d at 1145.24

We are not alone in emphasizing the importance of the funding factor. The Supreme Court recognized in Hess that

_____

22. Fitchik reformatted our test for Eleventh Amendment immunity from the nine questions identified in Urbano v. Board of Managers, 415 F.2d 247 (3d Cir. 1969), cert. denied, 397 U.S. 948 (1970). Funding encompasses the Urbano inquiry into whether satisfaction of a judgment would come from the state treasury, whether the agency had funds to satisfy the judgment, and whether the sovereign was immunized from responsibility for the agency's debt. Status encompasses the Urbano inquiry into how state law treated the agency generally, whether it was separately incorporated, could sue or be sued in its own right, or was immune from state taxation. Autonomy continues to address the Urbano inquiry into the degree of autonomy from state control. Fitchik specifically rejected the ninth Urbano factor, inquiry into whether the individual performed a governmental or proprietary function, as no longer relevant. See 873 F.2d at 659 n.2.

23. See Carter, 4 F. Supp. 2d at 390. Cf. 16 Pa. Stat. Ann. S 1403 (district attorney's expenses to be paid by county from its general funds).

24. See also Hess, 513 U.S. at 50 (describing "prevention of federal-court judgments that must be paid out of a State's treasury" as "the impetus for the Eleventh Amendment" and explaining that if the state is not obligated to pay any indebtedness, "then the Eleventh Amendment's core concern is not implicated").

14

the vulnerability of the state's purse is considered "the most salient factor" in Eleventh Amendment determinations. See 513 U.S. at 48 (citing courts of appeals cases at length). Indeed, the "vast majority of [courts of appeals] . . . have concluded that the state treasury factor is the most important factor to be considered . . . and, in practice, have generally accorded it dispositive weight." Id. at 49 (ellipses in original) (quoted in Christy, 54 F.3d at 1145).

In Fitchik we concluded that non-applicability of state funds provides an "extremely strong" indication that an agency is not the alter-ego of the state, so that the first factor weighed heavily against a finding of immunity. 873 F.2d at 664. The funding factor weighs even more heavily against immunity in this case than it did in Fitchik and Bolden, where approximately one-third and one-fourth, respectively, of the agencies' funds were provided by the states. See Bolden, 953 F.2d at 819. Here, despite the DA's efforts to elevate a statutory funding mandate to the status of "indirect" funding, it appears that no portion of the DA's funds are provided by the state and no portion of any judgment will be paid directly or indirectly by the state.25 As we reasoned in Bolden, "this most important fact weighs more heavily" against immunity as the proportion of state funding decreases. Id.

(2) Status under State Law – The status  of the DA's Office under state law is necessarily derived from Pennsylvania's Constitution, statutory and decisional law.26 As we defined this second question in Fitchik, it is whether state law treats an agency as an independent entity or as a surrogate for (i.e., as an arm of) the state. See 873 F.2d at 662; Christy, 54 F.3d at 1148 (same).

_____

25. Cf. Christy, 54 F.3d at 1145-1146 (rejecting arguments regarding state regulation of agency funding as irrelevant to the funding inquiry and reiterating that "under our case law" question is simply one of state's "affirmative obligation to pay").

26. See, e.g., Regents v. Doe, 519 U.S. 425 (1997) (explaining that federal question of whether state instrumentality has "independent status . . . or is instead . . . `one of the United States' within the meaning of the Eleventh Amendment . . . . . can only be answered after considering the provisions of state law that define the agency's character").

15

Pennsylvania's Constitution expressly defines District Attorneys as county rather than state officers. See Pa. Const., Article IX, Section 4 ("County officers shall consist of . . . district attorneys . . . and such others as may from time to time be provided by law."). The Pennsylvania Supreme Court has held equivalent language from a prior version of the Pennsylvania Constitution to be "crystal clear": the court explained that "[the Pennsylvania Constitution] states in the clearest imaginable language that district attorneys are county – not state– officers, and in Philadelphia, by virtue of [its Charter and a Constitutional amendment making county officers into officers of the city], are City – not State– officers, and no Procrustean stretch can alter or change or nullify this clear language." Chalfin v. Specter, 233 A.2d 562, 565 (Pa. 1967).27 The DA's Office attempts to minimize this apparently controlling authority by arguing that "the only proposition with which four Justices agreed was that the Philadelphia District Attorney is subject to the Philadelphia Home Rule Charter for election purposes." As those four Justices clearly recognized, however, the Philadelphia Home Rule Charter by its terms applied only to Philadelphia officials, rather than state officials; and their opinions did not in any way differentiate between the District Attorney's status for election purposes or any other purposes.

Pennsylvania's statutes also reflect the local status of the DA's Office. Under the Commonwealth Attorney's Act of 1850, 71 P.S. SS 732–101, et seq., district attorneys were redefined as the "chief law enforcement officer[s] for the

_____

27. The foregoing language is from the opinion of Chief Justice Bell, which was not joined by any other Justice. As the Chief Justice noted, however, "the majority of this 7 Judge Court agree . . . on this point and are convinced that under the Constitution of Pennsylvania . . . the District Attorney of Philadelphia is a City officer . . . ." Id. See also id. at 578 (Musmanno, J., dissenting) ("[I]n the present decision . . . FOUR Justices declare mathematically, specifically, and without equivocation that [the district attorney] is a CITY OFFICER.") (capitals in original); id. (Cohen, J., dissenting) ("The only position that enlists a majority of this Court determines that the District Attorney is a City Officer."); id. (Eagan, J., dissenting) ("Four of the seven members of this Court, including myself, are convinced that [the district attorney] is subject to the provisions of the Philadelphia Home Rule Charter. . .").

16

county in which [they were] elected." Id. at S 732–206(a).28
Since that time, local district attorneys have been elected29
and funded30 by their counties. Other provisions of
Pennsylvania statutory law similarly treat district attorneys
as county officials.31 The DA's Office, which has the burden
of proving its affirmative defense, does not identify any
Pennsylvania statutes treating local district attorneys as
state, rather than county, officials. Finally, Pennsylvania's
statute defining the scope of sovereign immunity does not
encompass district attorneys within its detailed definitions
of the agencies and employees protected from suit. 32

Consistent with its constitutional and statutory law,
Pennsylvania's case law defines district attorneys–
Philadelphia District Attorneys in particular – as local, and
expressly not state, officials. See Chalfin, 233 A.2d at 565.
See also, e.g., Schroeck v. Pennsylvania State Police, 362
A.2d 486, 490 (Pa. Cmwlth. 1976) ("District Attorneys and
their assistants are officers of the counties in which they
are elected and not officers of the Commonwealth.") (citing

_____

28. Prior to 1850, district attorneys had been appointed by the Attorney
General, a state executive, and were subject to his direct supervision and
control.

29. See Chalfin, 233 A.2d at 565 ("[I]t is important to further note that
. . . the District Attorney of Philadelphia . . . is Elected in municipal
[and
not] State–wide elections . . . .").

30. See note 23, supra.

31. For example, the Attorney General participates as a "state employee"
in the state's retirement program, while district attorneys participate in
their County Retirement System pursuant to County Pension Law. See
16 P.S. SS11651–11682.

The Pennsylvania Supreme Court has found it significant that "the
powers and functions of the [district attorneys'] office are found in
Title
16, Counties, of Purdon's Statutes." Duggan v. 807 Liberty Ave. Inc., 288
A.2d 750, 752 n.6. (Pa. 1972) (declining to hold district attorney as
"officer of the Commonwealth" under jurisdiction of Commonwealth
Court). See also Cross v. Meisel, 720 F. Supp. 486, 488 n.3 (E.D. Pa.
1989) (explaining that case regarding "state officials" was irrelevant to
suit against district attorney because, besides constitutional definition
as
county officers, district attorneys' duties are defined in the County Code
and their expenses are paid by the county from its general funds).

32. See 42 Pa.C.S.A. SS 102, 8501–8528.

Section 401(a)(11) of the County Code, as amended 16 P.S. S 401(1)(11)).33

The DA's Office argues that the various authorities holding district attorneys to be local officials are inapplicable because they did not involve prosecutorial conduct. In the "law enforcement and prosecutorial" context, according to the DA's Office, "courts have uniformly held that the District Attorney is an arm of the state". None of the Pennsylvania authorities cited, however, actually holds that a district attorney is a state officer or arm of the state in any context. Rather, these authorities relied upon by the DA's Office merely hold that district attorneys act on behalf of and in the name of the Commonwealth in investigating and prosecuting crimes within their district.34 See, e.g. Commonwealth v. Bauer, 261 A.2d 573 (Pa. 1970) (finding only that district attorney has power and duty to represent the Commonwealth's interests in law enforcement).

The District Court similarly equated simply acting in the name of the state with being an arm of the state entitled to share in its sovereign immunity. The District Court deemed the Pennsylvania authorities designating district attorneys as local officials irrelevant, because it erroneously believed performance of a sovereign function, such as investigation and prosecution of crime, was alone sufficient to accord local prosecutors sovereign immunity.35  This approach,

_____

33. The Commonwealth has similarly declined to hold assistant district attorneys to be state officials. See Specter v. Moak, 307 A.2d 884 (Pa. 1973) (refusing to classify Philadelphia assistant district attorneys as state officers simply because they enforce Commonwealth penal laws of state-wide application "in the name of the Commonwealth").

34. In Chalfin, Chief Justice Bell pointedly noted that "the essential and principal and most important powers, functions, duties, limitations and boundaries of the District Attorney of Philadelphia involve only crimes committed – not throughout the Commonwealth but– only in the City of Philadelphia." 233 A.2d at 565.

35. See Carter, 4 F. Supp. 2d at 390, 392 n.8 (dismissing constitutional provisions as "not in any way affect[ing] the District Attorney's function of investigating and prosecuting crimes in the name of the Commonwealth" and emphasizing that "[i]t would be hard to imagine functions more essential to the sovereignty of state government").

18

however, clearly proves too much; many local officials act in the name of the state and carry out delegated sovereign functions. Under such an expansive theory, every police officer, for example, would be entitled to Eleventh Amendment immunity. See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities even though such entities exercise a `slice of state power.' ").36

Pennsylvania case law makes it clear that performance of an essential sovereign function on behalf of or in the name of the state does not give rise to state surrogate status under state law. See Specter v. Commonwealth, 341 A.2d 481, 485–88 (Pa. 1975) (declaring Turnpike Commission unentitled to sovereign immunity although it was constituted as an "instrument of the Commonwealth" and performed "an essential government function of the Commonwealth"); Pennsylvania Gamefowl Breeders Ass'n. v. Commonwealth, 551 A.2d 361, 363 (Pa. Cmwlth. 1988) (finding district attorneys county officers, not state officers, although they are "charged with conducting criminal prosecutions in the name of the Commonwealth" and thus "perform sovereign functions of state government"); Specter v. Moak, 307 A.2d at 886 (rejecting Philadelphia Assistant District Attorneys' contention that "since they perform functions primarily on behalf of the Commonwealth they should be classified as state employees", reasoning that "[m]any officials" – such as the Mayor, Sheriff, Police Commissioner and City Solicitor – "perform state functions") (internal quotations omitted).37 Cf. Cross, 720 F. Supp. at 488 n.3 ("Although it is true that certain sovereign powers of the Commonwealth are delegated to a district

_____

36. The Lake Country Court observed that"some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability" but rejected a more "expansive reading" that would effectively immunize every agency, unless it were expressly waived. Id. at 400–401 (emphasis added).

37. The Moak Court further observed that it could not be argued that one is a state officer "merely because he has the duty to `cause . . . the laws of the State to be executed and enforced.' " Id.

19

attorney, this is true generally of county and local officials
. . . .").

Moreover, even if it were true that district attorneys act as an arm of the state, entitled to its sovereign immunity, whenever they perform prosecutorial functions in the name of the Commonwealth, it would not follow that the Eleventh Amendment immunizes the conduct at issue here.38 The District Court mischaracterized the basis of Carter's claim as a prosecutorial function and declined to distinguish the Philadelphia DA's training/supervision/administrative activities from its core state function of prosecution. In dismissing the possibility of a meaningful analytical distinction between a district attorney's prosecutorial and policy-making functions,39 the District Court adopted a position which would inappropriately pull all functions of the office within the scope of its (purportedly sovereign) prosecutorial function. Other federal courts have taken a different view. They have acknowledged the obvious basis for distinction: making and applying county-wide policy differs from carrying out state-wide policy and they have, therefore, repeatedly differentiated between administrative and prosecutorial functions, generally finding the former to be local and the latter to be state.

The most instructive (and analogous) case is Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992) from our sister court of appeals. Walker spent 19 years in prison after police officers and prosecutors covered up exculpatory evidence and committed perjury to secure his conviction.

_____

38. Carter argues that the nature of the function should not be considered because the Eleventh Amendment focuses on the status of the entity as a whole, and the functional analysis is erroneously borrowed from section 1983 decisions. As the DA's Office observes, the propriety of the functional analysis has been reserved by the Supreme Court. See Regents v. Doe, 117 S. Ct. 900, 902 n.2 ("Nor is it necessary to decide whether there may be some state instrumentalities that qualify as `arms of the State' for some purposes but not others.") In the present case it is similarly unnecessary to reach this issue, as application of our
Fitchik factors compels us to find that in Pennsylvania the prosecutor's office is not an arm of the state either generally or with respect to the managerial functions in question.

39. See Carter, 4 F. Supp. 2d at 393.

20

Id. at 294. In his section 1983 action, Walker alleged that the district attorney's office failed adequately to train and supervise police with respect to the obligation to avoid use of perjury and suppression of exculpatory evidence. Id. at 295, 298. In holding that Walker stated a proper claim against the district attorney's office, the Court of Appeals determined that "the district attorney's management of the office -- in particular the decision not to supervise or train [assistant district attorneys] on Brady[40] and perjury issues" -- constituted policymaking for the county, rather than the state. Id. at 301. The Court observed that an earlier case holding that the district attorney is a state official[41] was limited to "specific decisions . . . to prosecute." Id. (citing Gentile v. County of Suffolk, 926 F.2d 142, 152 n.5 (2d Cir. 1991)). See also Gan v. City of New York, 996 F.2d 522, 536 (2d Cir. 1993) ("With respect . . . to claims centering not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned.") (citing Walker and Gentile).[42] As recently as last year, the Court of Appeals for the Second Circuit applied the Walker and Gentile holdings in finding a county liable under section 1983 for its district attorney's implementation of a policy regarding investigative procedures. See Myers v. County of Orange, 157 F.3d 66, 77 (2d Cir. 1998).

Other courts of appeals have similarly recognized the hybrid nature of the district attorney's office–distinguishing between a DA's prosecutorial function and his role as elected county policymaker. See, e.g., Esteves v. Brock, 106 F.3d 674, 678 (5th Cir. 1997) ("A county official

_____

40. Brady v. Maryland, 373 U.S. 83 (1963) recognized that prosecutorial suppression of exculpatory evidence violates due process.

41. See Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988) ("[W]hen prosecuting a criminal matter, a district attorney in New York State . . . represents the State, not the county.").

42. The Gan court's parenthetical descriptions of Walker and Gentile indicate that it considered "administration" to include "office policy governing . . . subornation of perjury" and "office policy as to disciplining
of law enforcement personnel". Id.

`pursues his duties as a state agent when he is enforcing state law or policy' " by conducting trials; but "[f]or those [remaining] duties that are administrative or managerial in nature, . . . a district attorney . . . functions as a final policymaker for the county.") (quoting Echols v. Parker, 909 F.2d 795, 801 (5th Cir. 1990);43Pusey v. City of Youngstown, 142 F.3d 435 (6th Cir. 1998) (prosecutor is city official but acts as state agent when enforcing state law or policy); Owens v. Fulton County, 877 F.2d 947, 952 (11th Cir. 1989) ("[A]n official may simultaneously exercise county authority over some matters and state authority over others. . . . [A]n administrative function . .. might be characterized as an exercise of county power. However, . . . the district attorney's authority over prosecutorial decisions . . . is vested . . . pursuant to state authority."). Cf. Franklin v. Zaruba, 150 F.3d 682 (7th Cir. 1998) (sheriff is acting as county official, and not acting as agent of state, at time of alleged failure to properly train subordinates or establish policies to protect arrestees); Scott v. O'Grady, 975 F.2d 366, 370 (7th Cir. 1992) (sheriff is local official when serving as "chief law enforcement officer" of county, but arm of state when enforcing state court order).44

The recurring theme that emerges from these cases is that county or municipal law enforcement officials may be State officials when they prosecute crimes or otherwise carry out policies established by the State, but serve as local policy makers when they manage or administer their own offices. Indeed, we ourselves concluded in Coleman v. Kaye, 87 F.3d 1491, 1499 (3d Cir. 1996), that county prosecutors can have "a dual or hybrid status." When "enforcing their sworn duties to enforce the law . . . they act as agents of the State [but] when county prosecutors are called upon to perform administrative tasks unrelated to their strictly prosecutorial functions . . . the county prosecutor in effect acts on behalf of the county that is the

_____

43. See also Davis v. Ector County, Texas, 40 F.3d 777 (5th Cir. 1995) (DA is local policy maker for purposes of personnel decision (firing), even
though state official when enforcing state law).

44. Cf. Commonwealth Attorney's Act of 1850, 71 P.S. SS 732-206(a), defining district attorneys as the "chief law enforcement officer[s] for the
county in which [they were] elected."

situs of his or her office." Id. Absent direct intervention by the state, county prosecutors act as county officials when they are called upon to make administrative decisions on a local level. See Coleman, 87 F.3d at 1504 (applying New Jersey law).45

Reading the Complaint in the light most favorable to Carter, it appears that the function complained of here is not prosecutorial, but administrative: it involves local policies relating to training, supervision and discipline, rather than decisions about whether and how to prosecute violations of state law. Therefore, even if a member of the Philadelphia DA's Office were deemed a state actor with respect to prosecutorial functions, she would nevertheless be a local policymaker with respect to the conduct at issue here.

(3) Autonomy - When the District Court considered autonomy from the Commonwealth, it concluded that factor weighed strongly in favor of immunity.46 This finding is contrary to Pennsylvania's consciously and deliberately designed autonomous role for its district attorneys; it is also contrary to our prior decisions. In Pennsylvania, the Attorney General (the "AG") is without authority to replace a district attorney (who must be impeached, like other locally elected officials) and in Pennsylvania, unlike many other jurisdictions, the AG has no inherent authority to supersede a district attorney's decisions generally. 47 The

_____

45. In Coleman we distinguished between the "day-to-day management of the prosecutor's office" - a function in which the DA acts as a county official - and the use of a "grossly erroneous" search warrant - an investigatory and prosecutorial function in which he acts as a state official. Id. at 1502, 1505.

46. The District Court initially focused on the political autonomy of the DA's Office from the City of Philadelphia. Autonomy is measured, however, by the DA's Office's relationship with the Commonwealth (i.e., the more autonomous, the less an "alter ego" of the state). Moreover, the asserted autonomy from the City actually supports Carter's position with respect to the "failure to state a claim" argument addressed infra Section V, as it underscores the DA's role as final policymaker on law enforcement issues for the City. Cf. Degenova v. Sheriff of DuPage County, 18 F. Supp. 2d 848, 852 (N.D. Ill. 1998).

47. See Commonwealth v. Lawson, 658 A.2d 801, 803 (Pa. Super. 1995) (describing Commonwealth v. Khorey/Trputec, 555 A.2d 100 (1989), as

23

Pennsylvania AG is permitted only a narrowly circumscribed power to supersede a district attorney in a particular criminal prosecution subject to court authorization under an abuse of discretion standard (or at the district attorney's own invitation).48  The mere possibility of supersession by the AG through cumbersome court proceedings is insufficient to support the District Court's conclusion that lack of autonomy weighed in favor of holding the DA's Office an arm of the state.

To the contrary, in Coleman we concluded that "[d]espite the Attorney General's statutory power of supersession, ` . . . the [county] prosecutors are largely independent of control by the attorney general . . . .' " 87 F.3d at 1504 (quoting Morss v. Forbes, 132 A.2d 1, 16 (N.J. 1957)).49 As

_____

"establish[ing] categorically that the Attorney General, pursuant to statute which supplanted common law, has no authority to supersede the District Attorney"); Commonwealth v. Carsia, 491 A.2d 237, 251 (Pa. Super. 1985) (explaining that limited criminal jurisdiction extended to AG in Commonwealth Attorney's Act reflected legislature's concerns that it not "imping[e] upon the jurisdiction and duties of the constitutionally created office of county-elected district attorney").

48. See 72 P.S. S 732-205(a)(3)-(5).

The Pennsylvania Supreme Court has explained that although the AG "had the common law power to replace his own deputies," that "does not justify the conclusion that he now has the right to supersede an elected district attorney." Commonwealth v. Schab, 383 A.2d 819 (Pa. 1978). In refusing to require at the AG's request prosecution of a homicide the district attorney deemed excusable, the Court observed that "[i]t would be incongruous to place a district attorney in the position of being responsible to the electorate for the performance of his duties while actual control over his performance was, in effect, in the attorney general." Id.

49. Moreover, the supersedure authority provided by New Jersey law is much more extensive than the limited supersedure under Pennsylvania law, in that it permits the AG broadly to supersede county prosecutors, leaving the prosecutors to "exercise only such powers and perform such duties as are required of them by the Attorney General." N.J. Stat. Ann. S 52:17(b)-106, quoted in Coleman. We held that even such a broad statutory supersedure scheme "provides county prosecutors . . . with a substantial degree of autonomy from the state government" in non-prosecutorial matters. Coleman, 87 F.3d at 1502.

24

we concluded in Coleman, "[i]t would be an unwarranted extension of the implications of the Attorney General's supersedure authority to conclude that the mere possibility of its exercise can somehow serve to bring [issues of "day-to-day management of the county prosecutor's office"] within the purview of the Attorney General's control." 87 F.3d at 1502.

In addition to the AG's power to supersede a particular failure to prosecute (with court approval), the District Court cited one other source of State control over district attorneys: the courts' power to supervise court proceedings.50 This power, however, is equally applicable to all persons who appear in court; and it is plainly limited to the district attorney's prosecution function. The other potential means of "control" cited by the DA's Office – e.g., impeachment, legislative acts, funding mandate, reporting requirement – similarly do not represent any meaningful practical restraint on the district attorney's autonomy from the Commonwealth. Cf. Hess, 513 U.S. at 61-62 (O'Connor, J., dissenting) ("The critical inquiry . . . should be whether and to what extent the elected state government exercises oversight over the entity. . . . . The inquiry should turn on real, immediate control and oversight rather than on the potentiality of a state taking action to seize the reins.");51 Fitchik, 873 F.2d 663 (evaluating autonomy in terms of independence from "supervision or control").

The limited state powers52 relied upon by the District Court and the DA's Office clearly do not extend to control over the district attorney's office administration in general, or over training, supervision and discipline of assistant

_____

50. See Carter, 4 F. Supp. 2d at 392.

51. Justice O'Connor viewed the state's power to appoint and remove an agency's officers, to veto its actions, to receive its annual reports, and to approve or disapprove each of its rules and projects as evidence of the type of authority which would support a finding of immunity. Id. at 63.

52. The power of the legislature (and to a lesser extent the courts) over the DA's Office is of course not narrowly limited; but "autonomy" would be a meaningless concept if it were rendered inapplicable by subjection to the (unexercised) legislative and judicial powers, to which all persons are subject.

district attorneys and police officers in particular. If we should focus on the particular function at issue in determining status under state law, we should do so in determining autonomy as well. Moreover, even a substantial degree of control by the state would cause the autonomy factor to weigh only slightly in favor of according immunity. See Fitchik, 873 F.2d at 664 ("Since the degree of control . . . is fairly substantial, we think that this factor counsels slightly in favor of according immunity . . . .") (emphasis added). See also Christy, 54 F.3d at 1149 ("[T]he significant control the Commonwealth exercises through the power to appoint all the members of the Commission weighs slightly in favor of Commission immunity. . . .") (emphasis added).

Balancing – In balancing the Fitchik factors, the District Court concluded that although the first factor weighed against immunity, the remaining factors weighed "strongly in favor of finding that the District Attorney's Office, when performing its historic functions of investigating and prosecuting crimes on behalf of the Commonwealth, is an `arm of the state' not subject to suit in federal court without its consent." See Carter, 4 F. Supp. 2d at 393. Because, as explained above, the District Court misapplied the second and third factors, it erred in the balancing as well.53

In Fitchik, we found that the non-applicability of state funds outweighed the combination of an ambiguous status under state law that balanced slightly in favor of immunity together with "fairly substantial" state control over the agency. See also Christy 54 F.3d at 1150 (finding that balance is "clearly struck" against immunity where funding

_____

53. Cf. Hess, 513 U.S. at 47 (stating that when indicators of immunity point in different directions, the court is guided primarily by the Eleventh Amendment's twin reasons for being: the States' dignity and their financial solvency). A suit for damages against a district attorney's office does not implicate the dignity of the state. The federal courts' consideration of status and autonomy under state law preserves the state's dignity by making its chosen structures controlling. Here, even if there is some doubt as to the entity's status under the law, and even if there is some degree of control by the state, the status and control do not rise to the level at which the exercise of judicial power over the DA's Office would offend the dignity of the State.

26

factor weighed against, and only one factor – autonomy – weighed slightly in favor).54 Here the funding factor weighs more heavily against immunity than in Fitchik and Bolden; the claim of state entity status under state law appears substantially weaker than in those cases in view of the express designation as a county official under constitutional, statutory and case law; and, at least for practical purposes, the autonomy of the DA's Office is greater than that of the transit authorities in those cases. Accordingly, as in Bolden, "[s]ince we are not prepared to overrule Fitchik, it follows that [the DA's Office] is not protected by the Eleventh Amendment." 953 F.2d at 821.55

IV. PROSECUTORIAL IMMUNITY

We must begin with "[t]he presumption . . . that qualified rather than absolute immunity is sufficient to protect

_____

54. An illuminating comparison of circumstances in which we have found extension of immunity and those in which we have not appears in Bolden, 953 F.2d 815-16. We there observed that we found immunity where we concluded that the state intended the agency be considered a state agency for Eleventh Amendment purposes, the state was obligated to meet the agency's liabilities, the agency's commissioners were appointed by the state, and the state retained substantial power over the agency's actions. Port Auth. Police Benevolent Assoc. v. Port Auth. of N.Y.
and N.J., 819 F.2d 413 (3d Cir. 1987). On the other hand, we refused to find immunity where an agency was state-created and largely state-funded but was "independent" and "direct[ed] its own actions" and was "responsible on its own for judgments resulting from [its] actions." Kovats v. Rutgers, 822 F.2d 1303, 1312 (3d Cir. 1987).

55. We note that the DA's Office provides an impressive-looking list of cases to support the proposition that "Judges across the country have agreed, virtually without exception, that district attorneys are state officials protected by Eleventh Amendment immunity." It must be remembered, however, that the determinative factors of funding, state law status and autonomy will vary from state to state, so that decisions concerning other states' district attorneys provide very little guidance absent a comparison of those factors. The cited cases do not withstand such a comparison because they involved state funding, state supervision, and/or a state court determination that prosecutors were state officials. The DA's Office omits to mention cases in which the same courts of appeals have held district attorneys in other states within their
jurisdiction to be local officials.

27

government officials in the exercise of their duties" and the observation that the Supreme Court has been "quite sparing" in its recognition of absolute immunity. Burns v. Reed, 500 U.S. 478, 486-87 (1991).56  We also note that the Supreme Court directs a "functional" approach to immunity issues, id., and requires the official seeking absolute immunity to bear the burden of showing it is justified for the function in question, see Buckley v. Fitzsimmons, 509 U.S. 259 (1993).

With this guidance, we conclude that the alternative argument of the DA's Office that Carter's section 1983 claims should have been dismissed due to absolute prosecutorial immunity lacks merit, because Carter does not complain about conduct on the part of the DA's Office in the course of his prosecution. See Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976) (prosecutors are immune from suit under section 1983 for "initiating and pursuing a criminal prosecution"). None of the cases cited by the DA's Office extends this prosecutorial immunity to administrative, rather than prosecutorial, conduct.

Rather, as we have previously explained, "prosecutors are subject to varying levels of official immunity" and absolute prosecutorial immunity attaches only to "actions performed in a `quasi-judicial' role", such as participation in court proceedings and other conduct "intimately associated with the judicial phases" of litigation. Guiffre v. Bissell, 31 F.3d 1241, 1251 (3d Cir. 1994) (quoting Imbler, 424 U.S. at 430).57 "By contrast, a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity." Id. (citing Imbler, 424 U.S. at 430-31; Burns, 500 U.S. at 483-84 n.2, 111 S. Ct. at 1938 n.2). 58

_____

56. See also Schrob v. Catterson, 948 F.2d 1402, 1409 (3d Cir. 1991).
57. In Imbler, the Supreme Court held "only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under S 1983" and left open the question of whether absolute immunity would apply to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate" for the state. 424 U.S. at 430-31.

58. In Guiffre, we followed the Supreme Court's holding in Burns that a prosecutor is not absolutely immunized for advice given to police during

28

Qualified immunity protects official action "if the officer's behavior was `objectively reasonable' in light of the constitutional rights affected." Id. If Carter succeeds in establishing that the DA's Office defendants acted with deliberate indifference to constitutional rights- as Carter must in order to recover under section 1983, then a fortiori their conduct was not objectively reasonable.

V. FAILURE TO STATE A CLAIM UNDER SECTION 1983

As the District Court observed, the standard for personal liability under section 1983 is the same as that for municipal liability. See Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). That standard was enunciated in Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978): "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under S 1983." Where, as here, the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to "deliberate indifference" to the rights of persons with whom those

_____

the investigative stages of a criminal proceeding. See 31 F.3d at 1253, citing Burns, 500 U.S. at 496.

In addressing the question left open in Imbler, and resolving a subsequent split among the courts of appeals, the Burns Court expressly rejected argument that a prosecutor's directory role in police investigations is sufficiently related to her advocate function. The Supreme Court explained that "[a]lmost any action by a prosecutor . . . could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." Burns, 500 U.S. at 495. The Court also rejected the government's argument that adequate checks on prosecutorial misconduct in this context exist, observing that "one of the most important . . . checks, the judicial process, will not necessarily restrain
a prosecutor's out-of-court activities that occur prior to the initiation of
a prosecution." Id. Thus it concluded that neither common law nor policy considerations support an extension of absolute immunity, which applies "only for actions that are connected with the prosecutor's role in judicial
proceedings, not for every litigation-inducing conduct." Id. at 494.

29

employees will come into contact. City of Canton v. Harris, 489 U.S. 378, 388 (1989).

The Court in Canton observed that failure to train may amount to deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights. See id. at 389. For example, if the police often violate rights, a need for further training might be obvious. See id. at 390 n.10. See also Sample, 885 F.2d at 1118 (deliberate indifference may be established where harm occurred on numerous previous occasions and officials failed to respond appropriately, or where risk of harm is great and obvious).

Once again, the factually similar Walker case is instructive. The Walker court analyzed Canton's discussion of the deliberate indifference requirement and formulated a three-part test: in order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; 59 (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. See Walker, 974 F.2d at 297-98.

In the present case, as in Walker, elements (1) and (3) are plainly met: "city policymakers know to a moral certainty that police officers will be presented with opportunities to commit perjury or proceed against the innocent. Moreover, a failure by police officers to resist these opportunities will almost certainly result in deprivations of constitutional rights." Id. at 299. As for element (2), although it may usually be appropriate to assume employees will obey their oaths and the perjury laws, "where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so." Id. at 300.

_____

59. Although the Walker Court, adopting language from Canton, indicated that the policymaker's knowledge should be"to a moral certainty", it does not appear that this qualifying phrase adds anything other than emphasis to the requirement of ordinary knowledge.

The Court of Appeals concluded that "Walker should be allowed to pursue discovery in order to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) 60 or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth." Id. The same result should apply to Carter.61

The District Court's insistence that Carter must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh.62 Carter is not engaged in a mere fishing expedition. Carter alleges that he spent ten years in prison as a result of a pervasive pattern of egregious, unconstitutional conduct by Philadelphia's police. He surmises, reasonably, that such misconduct reflects inadequate training and supervision. He cannot be expected to know, without discovery, exactly what training policies were in place or how they were adopted.63

_____

60. Cf. Gentile, 926 F.2d at 152 n.5 (predicating liability on "long history of negligent disciplinary practices regarding law enforcement personnel . . . .").

61. If Carter is able to demonstrate that the DA's failure to adopt a policy amounts to deliberate indifference, he must of course then establish that his conviction was "actually caused" by that failure. Canton, 489 U.S. at 391; see also Sample, 885 F.2d at 1118 (requiring plaintiff to prove his injury "resulted from" the failure to adopt a policy). The Canton Court explained that actual causation turns on whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." 489 U.S. at 391.

62. The District Court read the Complaint as asserting only passive adoption by the DA's Office defendants of a policy imposed by the City. See Carter, 4 F. Supp. 2d at 394–95. Nonetheless, an appropriately generous reading would indicate that the DA's Office defendants were the policymakers who adopted the inadequate training, supervision and discipline policies on behalf of the City.

63. Cf. Gentile 926 F.2d at 152 ("Plaintiffs were not obliged to produce particular evidence that defendants had specific knowledge of a declared policy of the County . . . .").

VI.

We hold that (1) the Philadelphia District Attorney's
Office is a local agency not within the Commonwealth's
Eleventh Amendment immunity for purposes of claims
arising from administrative and policymaking – rather than
prosecutorial – functions; (2) the official capacity claims are
not alternatively barred by absolute prosecutorial
immunity; and (3) the personal capacity claims have been
adequately pled. Accordingly, we will reverse the District
Court's dismissal of Carter's claims against the DA's Office
and remand for further proceedings.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

32